THE STATE OF NEVADA, Respondent, *v* FREDRICK WILLIAM TEETER, Appellant

No. 3501

December 1, 1948.                    200 P.2d 657.

586

*Thruston, Salter & Bonner*, of Las Vegas, for Appellant.

*Alan Bible*, Attorney General, *Geo. P. Annand* and *Homer Mooney*, Deputy Attorneys General, *Robert E. Jones*, District Attorney, and *Harry E. Claiborne*, Deputy District Attorney, both of Las Vegas, for Respondent.

## OPINION

By the Court, Horsey, J.:

On the 28th day of February 1947, the defendant Fredrick William Teeter, was, by the verdict of the jury duly sworn and impaneled upon his trial in Department 2

of the Eighth judicial district court of the State of Nevada, in and for the county of Clark, to try the issue of his guilt or innocence, convicted of the crime of murder of the second degree. On March 3, 1947, the time set for pronouncing judgment, the court, after hearing and denying a motion in arrest of judgment and a motion for a new trial, presented and argued by John W. Bonner, Esq., attorney for the defendant, pronounced judgment adjudging the defendant, Fredrick William Teeter, guilty of murder in the second degree, and that he be punished by imprisonment in the State Prison of the State of Nevada for the term of not less than ten (10) years and which may extend to life. From such judgment of conviction and the order denying his motion for a new trial the defendant has appealed to this court. In this opinion the parties will be usually designated as plaintiff and defendant, as they were in the court below.

The defendant, upon this appeal, has presented eleven assignments of error, which have been fully argued and briefed by the respective counsel. We will consider them in the order in which they appear in appellant's opening brief.

■ The first of such assignments is: "The Court erred in denying defendant's motion for bail." In considering the case, it has been a matter of serious concern whether at this stage of the case we have the right, upon the appeal from the judgment, to consider this question of the denial of bail. It is most unusual to wait until a determination of the right to bail would be unavailing, insofar as bail before conviction is concerned, and then to raise the question upon the appeal, upon the theory that the alleged wrongful denial of bail goes to the validity of the judgment. When bail has been wrongfully denied by a court or magistrate, and the defendant is in custody, the usual procedure is by an original application to another court or magistrate, including the supreme court or any justice thereof, for a writ of

habeas corpus. This is usually done very soon after the first denial.

■ In Nevada there is no appeal to this court from the denial of bail by a lower court or magistrate in a habeas corpus proceeding, but in many states allowing such appeals they are numerous. But in this state an original application for a writ of habeas corpus may be made to another court or magistrate, even to this court or a justice thereof, notwithstanding the denial, by another court or magistrate, of a former original application.

In some states a defendant, in custody, claiming he is unlawfully restrained of his liberty, may appeal directly to the supreme court from an order denying a motion for bail, but we have no provision for such an appeal in this state.

The question as to the right of the supreme court, upon appeal from the judgment, to consider such an assignment as that in the instant case, that bail has been erroneously denied, depends upon the construction of section 11087, vol. 5, N.C.L.1929, which is as follows:

"§ 11087. Intermediate Order Or Proceeding May Be Reviewed On Appeal. § 439. Upon the appeal, any decision of the court in an intermediate order or proceeding, forming part of the record, may be reviewed."

This provision, at the time of its adoption, was taken from a like provision (in all essentials, identical) of the California Penal Code, sec. 1259.

The California provision has been amended, making it very clear that in a criminal case every kind of intermediate order which affected the substantial rights of the defendant may be reviewed upon the appeal. Said sec. 1259, as amended, reads as follows:

"§ 1259. (Questions reviewable upon appeal by defendant: Necessity for exception or objection.) Upon an appeal taken by the defendant, the appellate court may, without exception having been taken in the trial court, review any question of law involved in any

ruling, order, instruction or thing whatsoever said or done at the trial or prior to or after judgment, which thing was said or done after objection made in and considered by the lower court, and which affected the substantial rights of the defendant. The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby. (Enacted 1872; Am.Stats.1909, p. 1088; Stats.1939, p. 2801.)"

It appears clear that the amendment in California merely clarified the inherent meaning of said provision, and that our Nevada sec. 11087, taken from it in its original form, means substantially the same as the California provision thus clarified — that such all-embracive character is inherent in its provisions.

In California almost every conceivable kind of an order made in a criminal action or proceeding after the filing of an indictment or information has been held subject to be reviewed upon appeal from the judgment. Among such orders held reviewable, upon the appeal proper, are: Order refusing to grant continuance, order denying motion to set aside indictment, and order denying right to file application for probation.

As to the latter, the California District Court of Appeal for the Second district, division 1, in People v. Jones, 87 Cal.App. 482, 262 P. 361, 367, in the opinion by Mr. Justice pro tem. Shaw, analyzed the above-quoted sec. 1259 of the penal code, and, after quoting same, stated its conditions or requirements, in order that the appellate court may review a ruling of the trial court, as follows:

"Under this provision, five conditions must be complied with in order that the appellate court may review a ruling of the trial court: (1) An appeal taken in open court; (2) a question of law involved in the ruling; (3) a ruling at the trial or prior to or after judgment (not including orders which are directly appealable); (4) objection made in and considered by the lower court

before the ruling (except in case of an instruction) ; (5) a ruling or order which affected the substantial rights of the defendant."

Applying this test to the proceedings had in the lower court before Judge Henderson, upon the motion by defendant for bail, in order to determine whether the defendant has the right of review by this court upon the pending appeal under our sec. 11087, vol. 5, N.C.L. 1929, adopted originally from said sec. 1259 of the California penal code, we find that all the requirements and conditions thus stated in People v. Jones, supra, existed in the instant case.

In the case of State v. Waterman, 36 Idaho 259, 210 P. 208, the defendant, in appealing from the judgment of conviction, assigned as error the refusal of the trial court to admit him to bail pending the appeal. The court did not pass upon the question of whether the lower court abused its discretion in denying the application for bail, for the reason that in the record as presented there was no showing as to the reason upon which bail was denied by the lower court. The Supreme Court of Idaho, however, considered or reviewed the matter upon the appeal proper, and Mr. Justice Dunn, in the opinion (on page 272 of 36 Idaho, page 212 of 210 P.), stated:

"Appellant complains of the refusal of the trial court to admit him to bail pending this appeal. In cases of this character the admission of defendant to bail after conviction is a matter of discretion with the trial court. C.S. sec. 9096; In re Schriber, 19 Idaho 531, 114 P. 29, 37 L.R.A.,N.S., 693. Unless there is good reason for refusing bail, a defendant sentenced to imprisonment ought not to be compelled to submit to imprisonment while he is prosecuting an appeal in good faith. In this case the record does not show for what reason the court refused to admit appellant to bail, and on the record as it is presented here we are unable to hold that such refusal was an abuse of discretion."

Gillis v. Commonwealth, 202 Ky. 821, 261 S.W. 591,

is a case in which the defendant had been convicted of murder, and appealed from the judgment. The lower court had refused, upon an application before trial, to hear defendant's motion for bail. The court of appeals, upon the appeal from the judgment considered such refusal, and under the circumstances of the case, determined the refusal to hear the application, was error, and such error was one of the errors for which the judgment of conviction was reversed. In view of the reasoning of the Kentucky appellate court, it is believed that if a hearing had been had and bail denied in the lower court, the court of appeals, under the facts and circumstances of that case, would have deemed such denial an abuse of discretion, and as clearly a ground for reversal as was the denial of the hearing. In that court's view, the gist of the injury to defendant was the lack of opportunity, for the proper preparation of his defense. As reported on page 593 of said 261 S.W., Hobson, C., in his opinion, stated:

"In view of the fact that the defendant had been confined in jail ever since the killing 14 miles from the scene of the homicide, and that he had no opportunity to prepare his defense, as shown by the affidavit of his attorneys accompanying his affidavit on the motion for a continuance, we are clearly of opinion that the defendant had not had a reasonable opportunity to prepare and present his defense. The court had refused to hear his motion for bail. The right to bail is a constitutional right, and the exercise of this right in cases of this sort is often essential to the proper preparation of the defendant's case. Counsel should have a reasonable time and opportunity to get his bearings, to look over the ground and study the case in its various aspects, and in all cases where it is possible a hearing on the question of bail should not be denied."

■ In the instant case, we decide and hold that the order of the district court denying the defendant's

motion for bail was an order in an intermediate proceeding—properly forming a part of the record, and that such order comes within the language, intent and spirit of sec. 11087, vol. 5, N.C.L.1929, and may be reviewed upon this appeal from the judgment.

Bearing in mind that the instant case, at the time of the hearing of the application for bail, was a capital case, in which murder was charged and in which, upon the basis of the information, a verdict of first degree murder could have been found by the trial jury, did the lower court commit error in denying the defendant's application for bail?  Our constitutional provision relative to the right to bail of one charged with crime is as follows (sec. 7 of art. I of the constitution of Nevada, N.C.L.1929, vol. 1, sec. 28) :

"All persons shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident or the presumption great."

■ The foregoing provision of our constitution, and similar or identical provisions in the constitutions of nearly all of the states comprising the United States of America, are very generally held to guarantee bail as *a matter of right* in all cases before convictions, *unless* (except) *in capital offenses when the proof is evident or the presumption great.*  It is clear that the only cases in which, before conviction, bail is not a matter of right is in a special class of capital cases, namely, those in which the proof is evident or the presumption great. Conversely, in all capital cases in which the proof of guilt is not evident and the presumption thereof is not great, bail is, constitutionally a matter of right.

There is a great diversity in the views of the courts of last resort of the various states in regard to the method to be employed in determining the right to bail. To what extent, in capital cases, the available evidence of prosecution witnesses and other witnesses, or documentary evidence, may be employed in proceedings

before a court or a magistrate to admit to bail, and to what, if any, extent presumption, either conclusive or merely prima facie, shall be given effect, are the questions concerning which the major differences in the authorities have arisen.

Much of the conflict and confusion of the cases in the United States is due to the fact that the courts of many states have followed the doctrine reached in the earlier English cases under the common law, to the effect that a *conclusive* presumption of guilt arose upon an indictment for murder, which continued as to all preliminary proceedings until such presumption gave way to, or was superseded by, the presumption of innocence.

In Lord Mohun's Case, 1 Salk. 104, it was stated:

"If a man be found guilty of murder by the coroner's inquest, we sometimes bail him, because the coroner proceeds upon depositions taken in writing which we may look into; otherwise, if a man be found guilty by a grand jury, the court cannot take notice of their evidence, which they, by their oath, are bound to conceal."

It is also true that the English courts, when a defendant charged by complaint before a magistrate for the crime of murder was bound over upon the basis of evidence furnished in the form of depositions, would, upon application for bail, inquire into the sufficiency of the evidence, because same was available. See the Colorado case of In re Losasso, 15 Colo. 163, 24 P. 1080, 10 L.R.A. 847, in which, in the able and scholarly opinion of Mr. Chief Justice Helm, the English law and some of the English cases and many of the earlier American decisions are discussed. Also, we cite the valuable and comprehensive note in 39 L.R.A.,N.S., pages 752–785; also 6 Am.Jur. pp. 55–73; and 8 C.J.S., Bail, sec. 34, pages 53–63, upon the general subject of right to bail in capital offenses.

It is apparent from the English cases that the reason for the English rule, was that the requirement of secrecy as to grand jury proceedings, was so far-reaching that witnesses before a grand jury could not

testify upon the same subject before any other tribunal. Such requirement has never prevailed to any consider- able extent in the United States. Indeed, in many states the minutes of grand jury proceedings must be kept in writing and are available, upon a proper showing, for legitimate use in other tribunals or courts. 6 Am.Jur. 71, 72.

■ And in many states, including Nevada, the names of witnesses known to the district attorney at the time of filing the indictment or information are required, by statute, to be endorsed thereon by the district attorney or his deputy. This provision includes, of course, the names of the witnesses who have testified before the grand jury. They are, with rare exception, known to the district attorney, who is the officer authorized by statute to examine witnesses before the grand jury. The purpose of such provision is apparent. It is primarily for the purpose of informing the defendant (after his arrest, and the indictment or information is no longer secret, as it has been before), and his counsel, of the witnesses for the prosecution, in order that he may have fair opportunity to prepare his defense. The identity of the prosecution's witnesses thus becoming public knowledge, they are entirely free to testify in court or before a magistrate upon an application for bail, but they must not, of course, divulge what they testified to before the grand jury, unless under an exceptional show- ing of good reason therefor, or for purposes of impeach- ment.

Despite the absence of reason therefor, the authorities of some states still adhere, to a greater or lesser extent to the old English theory of artificial legal presump- tion—some to the extent of recognizing the presumption as conclusive in first degree murder cases, unless special or extraordinary circumstances exist (which exception was recognized at common law), whilst the authorities of other states recognize the presumption only to the extent of making it prima facie and rebuttable. Still other states open the door freely to a fair inquiry or

investigation into the actual facts and circumstances of the particular case, in order that the determination of the decisive question of whether the proof is evident or the presumption great may be predicated upon truth and fact, rather than wholly or in part upon artificial legal presumption.

For a scholarly treatment of the subject, in which the authorities of the various states are differentiated, and grouped generally as above stated, see State v. Koester, 1931, 5 W.W.Harr., Del., 258, 162 A. 513, cited by plaintiff. We do not agree with counsel for the state, however, in their conclusion that Nevada properly falls in either the first, or, at the most, the second, class of jurisdiction as classified in State v. Koester, supra (respondent's brief, p. 20), or that the opinion in Ex parte Nagel, 41 Nev. 86, 167 P. 689, properly construed, justifies that interpretation. That case will be considered hereinafter.

The last vestige of reason for allowing an indictment to have the effect of a presumption, either conclusive or prima facie, in Nevada was removed by the adoption in this state, in 1913, of the system of prosecution by information. While prosecution by indictment still exists, it is not frequently employed. Under the information system, instead of the solemn, collective action of a body of seventeen persons (twelve of whom were necessary to indict), reported with considerable formality to the court, and based upon the secret testimony of witnesses solemnly sworn before the grand jury, that system requires little formality. The details of the manner in which the district attorney, or his deputy shall conduct their investigations are not prescribed, but the final action in determining the filing of the information is that of one official, the district attorney, and there is no longer any solemn, collective action of a tribunal, predicated only upon sworn testimony of witnesses examined before them, and representing the composite judgment of at least twelve qualified grand jurors.

At this point it is proper to call attention to a case,

Ford v. Dilley, 174 Iowa 243, 156 N.W. 513–535, in which the able and exhaustive opinion of Mr. Justice Salinger evidences prodigious and scholarly research to an unusual degree. We quote from the opinion, 156 N.W. on page 520, the following:

"The rule has no support by cases that affirm it, and affirm also that bail is the rule and denial of it the exception. And it seems undeniable that under such Constitutions as ours bail is the rule; denying it the exception. This being so, no sound argument can be made for the claim that the general rules governing the proof of exceptions shall not obtain here.

"It can have no real support by cases which recognize that the rule rests wholly on the inability to get the evidence before the grand jury, recognize that all this is no longer true, and admit having statutes substantially like Code, § 5277, and then affirm the rule. See People v. Tinder, 19 Cal. 539, 81 Am.Dec. 77; Hyler's Case [People v. Hyler], 2 Parker Cr.R., N.Y., 570.

\*     \*     \*     \*     \*     \*     \*

"There is no support for the rule by cases which, though they themselves point out the changes that have occurred, draw only one conclusion therefrom, to wit: That, though all of the reason for the presumption is gone, half of the presumption survives. They follow up a concession that the foundation for making the indictment evidence is wholly destroyed, with making the indictment just enough evidence to call for rebuttal— require something to be rebutted which upon their concession should no longer be evidence."

Consideration will now be given to the Nevada cases which have dealt with the right to bail in capital cases. In Ex parte Isbell, 11 Nev. 295, a justice of the peace of Nye County, Nevada, had committed one W. D. Isbell, charged with the crime of murder. The grand jury thereafter impaneled had failed to indict him after examining the charge, and the district court, under the appropriate statute had, "upon sufficient cause having been shown," ordered the case resubmitted and the

defendant held to the next grand jury. His discharge upon habeas corpus was sought. While Mr. Justice HAWLEY found that the petition did not state sufficient facts to show that the action of the district court consituted an abuse of discretion, and, hence, that there was no basis for the discharge of the petitioner, he did not indicate that under the Nevada law any conclusive, or prima facie, presumption of guilt arose from the commitment. On the contrary, the learned justice stated, in effect, that upon such an application "the court's discretion is, at all times, to be exercised with sound judgment *upon a full consideration of the facts and circumstances of each particular case.*" (Emphasis added.)

In Ex parte Finlen, 20 Nev. 141, 18 P. 827, Mr. Chief Justice LEONARD rendered an able opinion which was the unanimous opinion of the court. In that case one Finlen had been indicted by the grand jury of Storey County, Nevada, for the crime of murder in the first degree. He applied to the Hon. Richard Rising, district judge, for a writ of habeas corpus, for the purpose of being admitted to bail, which was denied by said district judge, and the alternative writ dismissed and the prisoner remanded, "for the reason, among others, that the indictment found by the grand jury made the proof evident, and the presumption great, that the offense charged therein had been committed." A few days after such dismissal and remand, Finlen applied to Mr. Chief Justice LEONARD for the issuance of a writ of habeas corpus. One of the grounds for the dismissal of the temporary or alternative writ, presented by the attorney general, was, "Second, because an indictment for murder raises so great a presumption of the guilt of the defendant as to deprive him of the right to bail, and the finding of the grand jury cannot be reviewed on an application for bail, or its effect, in creating such presumption, be repelled by testimony as to his guilt or innocence." The opinion reviews at considerable length and in detail the law and the authorities relating to the

subject. A careful reading of the opinion clearly discloses the fact that the learned chief justice did not look with favor upon the presumption theory. He argued at great length to the opposite effect. At one point, on page 147 of 20 Nev. and on page 830 of 18 P. he was critical of Mr. Chief Justice Field's treatment, in People v. Tinder, 19 Cal. 547, of the decision in Lumm's case (Lumm v. State, 3 Ind: 293, 294), and in that connection stated:

"No person appreciates and admires the judicial ability of Justice Field more than myself. But it seems to me that he failed to give satisfactory answer to the arguments in Lumm's Case, whether they were entirely sound or not. And it should be remarked, in this connection, that Mr. Justice Sutherland's statement that 'the indictment must be taken as conclusive upon the degree of crime' is pure dictum, because Tayloe had not been indicted, and the court, upon his application for bail, did examine the depositions taken before the coroner. Besides, in Tinder's Case, it is admitted that, under 'special and extraordinary circumstances' in applications for bail, courts. or judges may look beyond the indictment. Why except such cases if the indictment precludes all inquiry? Every judge and lawyer of experience knows it is common practice, in cases of homicide, to indict for murder in the first degree. So common is it that the presumption spoken of by Justice Field, that the indictment charges the true crime, is at least greatly shaken."

Chief Justice LEONARD made many other statements in his opinion in Ex parte Finlen, supra, which preclude any conception on the part of this court that he intended to endorse the presumption theory to any extent whatsoever. And the learned justice considered all of the evidence, which he stated he had "examined with great care," but would not "run the risk of doing injury to the defendant or the state by commenting upon the evidence * * *." On the same page, just above the sentence above quoted, Justice LEONARD stated:

"Such was the case presented to me at the hearing upon this application, and upon which I granted leave to present *the oral testimony of all the witnesses examined before the grand jury, and any others the district attorney might suggest,* touching the allegations of the amended petition, to the end that the defendant might show, if he could, that all the evidence in the case showed that, under the statute referred to, he was not guilty of a capital crime." (Emphasis added.)

In Ex parte Nagel, supra, the defendant, Nagel, was held on a commitment issued out of the justice's court of Rawhide Township, to answer to the charge of murder. Nagel applied to this court for admission to bail, and relied entirely upon the transcript of the proceedings before the committing magistrate in Rawhide Township. Mr. Chief Justice MCCARRAN, in his opinion, stated (on page 87 of 41 Nev., page 689 of 167 P.) :

"Petitioner relies entirely upon this transcript, and contends that this transcript discloses a lack of evident proof and the absence of great presumption. In view of the fact that defendant must appear for trial before a jury in the district court, it might be improper for this tribunal to pass in detail upon the weight or conclusiveness of the evidence as set forth in the record of the committing magistrate. Any comment which we may deem necessary to make here is not to be regarded as passing upon the conclusiveness of the evidence as it is before us in the record."

Further on in the opinion, Mr. Chief Justice MCCARRAN stated the following (on pages 88, 89, of 41 Nev., pages 689, 690 of 167 P.) :

"As to whether or not there is evident proof or great presumption of a capital offense having been committed by petitioner, it will suffice, we think, to apply the rule and reason laid down in this court by Mr. Chief Justice LEONARD in the case of Ex parte Finlen, 20 Nev. 141, at page 151, 18 P. 827, at page 832. There the learned justice quoted approvingly from the review of Judge Cowen's opinion in the case of People v. McLeod, 1 Hill, N.Y., 377, 37 Am.Dec. 328, as follows:

" 'The true rule upon the subject of bail or discharge after indictment for murder undoubtedly is for the judge to refuse to bail or discharge upon any affidavit or proof that is susceptible of being controverted on the other side.'

"Later in the opinion, Mr. Chief Justice LEONARD stated the rule which we deem most applicable here as follows:

" 'If the question of a defendant's guilt of a capital offense hinges upon a fact involved in doubt, as if the existence of a fact on which his guilt or innocence of the offense charged in the indictment depends may from the evidence be found one way or the other, then bail should be refused.' "

Referring to Mr. Chief Justice LEONARD'S said quotation (on page 151 of 20 Nev., page 832 of 18 P.) from People v. McLeod, 1 Hill, N.Y. 377, 37 Am.Dec. 328, Mr. Chief Justice LEONARD quoted much more from People v. McLeod than the above sentence quoted by him and requoted by Mr. Chief Justice MCCARRAN. The next sentence quoted by Mr. Chief Justice LEONARD from this New York opinion by Tallmadge, J., in People v. McLeod, supra, following the clause "that is susceptible of being controverted on the other side," is as follows: "When, however, the prisoner's evidence is of that positive and certain character that it cannot be 'gainsaid,' then the prisoner is entitled to be bailed or discharged; * * *."

And referring to Mr. Chief Justice MCCARRAN'S further quotation, as above stated, from Mr. Chief Justice LEONARD'S opinion, which is introduced with the statement, "Later in the opinion, Mr. Chief Justice LEONARD stated the rule which we deem most applicable here as follows," and referring again to that part of the LEONARD opinion, on page 152 of 20 Nev., pages 832, 833 of 18 P., the expressions in the sentences immediately following the one quoted by Mr. Chief Justice MCCARRAN are significant. Immediately after the words "then bail should be refused," Mr. Chief Justice LEONARD stated further (on page 152 of 20 Nev., page

833 of 18 P.) : "But if his guilt of a capital offense depends upon a fact that is admitted by the state not to exist, or *if its non-existence is shown by all the evidence in the case; or if he is innocent of a capital offense upon a certain state of facts, and those facts are admitted, or if all the evidence in the case proves them to be true,—then the accused is entitled to bail. Nor does it matter that the grand jury, by finding the indictment presumably has passed upon the fact on which the prisoner's guilt of a capital offense depends, in whole or part, and has found against him thereon."* (Emphasis added.)

██ From the statement first above quoted from Mr. Chief Justice MCCARRAN'S opinion, it is apparent he believed it not sound judicial policy for the court or magistrate, in passing upon an application for bail, "to pass in detail upon the weight or conclusiveness of the evidence," if same was in conflict, nor to make extended comment thereon, which detailed consideration might unduly influence the proceedings in, or the outcome of, the trial. In the Nagel case, however, Mr. Chief Justice MCCARRAN carefully passed upon the evidence presented, which was embodied in the transcript, having first warned, in the language above quoted, that "Any comment which we may deem necessary to make here is not to be regarded as passing upon the conclusiveness of the evidence as it is before us in the record." Mr. Chief Justice MCCARRAN found a purported statement of the defendant standing in the record uncontradicted, together with other evidence tending to connect petitioner with the death of the deceased, "sufficient to warrant this court in saying that the proof is sufficiently evident and the presumption is sufficiently great to bring the case within the inhibition of section 7 of article 1 of the constitution, denying bail in capital offenses." We agree with Mr. Chief Justice MCCARRAN that upon an application for bail, the court or magistrate should not undertake to weigh the evidence in detail. If all of the evidence presented, as in the Nagel case, tends to indicate guilt of a capital offense, bail should be refused;

likewise, if there is substantial conflict in the evidence. On the other hand, it seems perfectly clear, from a careful study of all of the cases of this court which have passed upon the question of the right to bail under said constitutional provision, that if competent, admissible evidence presented to the court or magistrate upon the application for bail is not materially in conflict, but points, as in the instant case the testimony at the coroner's inquest indicated, towards an accident, and not an intentional, premeditated homicide sufficient to justify conviction of first-degree murder, the defendant should be admitted to bail. Such a state of the record, instead of establishing, even prima facie, that the proof is evident or the presumption great, establishes the contrary, and satisfies the burden of proof properly devolving upon the prisoner, as the moving party in the application for bail. We believe the expressions of this court in the past justify the conclusion that, whilst, in considering applications for bail the policy of this court has been not, prematurely, to undertake a detailed analysis of the weight of the evidence lest the trial court or jury might be improperly influenced, if from all the evidence presented, without substantial conflict, it appears clear and obvious that a capital offense has not been committed, the letter and spirit of sec. 7 of art. I of the Constitution of Nevada requires, and the court or magistrate considering such application should so hold, that the defendant should be admitted to bail.

Now considering, on the merits, the district court's denial of bail to defendant, Teeter, the facts, as disclosed by the record, are substantially as follows:

■ No preliminary hearing was held. The defendant waived it (his counsel saying upon the "request," but we say upon the "suggestion," of the deputy district attorney), in order that a more competent court or judge pass upon the proposed application for bail. This was agreed to by both parties. And, there having been no preliminary hearing, the only transcript or record containing the evidence in written form was the transcript

of the coroner's inquest proceedings. Such transcript was used by the defendant in making his motion for bail, and its use consented to by the deputy district attorney. Mr. Bonner, attorney for the defendant, did not formally offer the transcript in evidence, but suggested using a copy, to which no objection was made. The court inquired if Mr. Bonner "couldn't use it in your argument without the necessity of me reading it"; and, upon Mr. Bonner's suggesting that he believed the court should read it, the court asked for the copy then saying: "You may proceed." Mr. Bonner thereupon called Mr. Claiborne, deputy district attorney, as a witness, for the purpose, as he stated it, of showing "whether or not the district attorney's office has any evidence which would tend to support the charge of first-degree murder." That was a proper subject of inquiry. Even in the states still indulging a presumption of guilt from the fact of indictment in capital cases, the acknowledgment of the prosecuting attorney that he did not have sufficient evidence of first-degree murder to warrant conviction in that degree was sufficient to authorize admission to bail, though not technically constituting one of the special or extraordinary reasons or circumstances, as understood at common law, for admission to bail, notwithstanding such presumption. See statement of Field, C. J., in People v. Tinder, 19 Cal. 539, on page 549, 81 Am.Dec. 77; Ex parte Finlen, supra.

■ But Judge Henderson in the instant case expressed the view, "I don't think the district attorney has to disclose evidence at this time, not on this kind of a motion." Mr. Bonner insisted he "wasn't going to ask him for his evidence," and said further, "I was merely intending to ask him if he had evidence of that nature."

"The Court: Of what nature?

"By Mr. Bonner: Evidence sufficient to constitute the crime of first-degree murder, any evidence that will tend to prove it.

"The Court: He is entitled to that. The information calls for a trial for the crime of murder, so he must have

or they wouldn't very well prepare and file an information charging murder.

"By Mr. Claiborne, Deputy District Attorney: The presumption is, Your Honor, that the filing of the complaint—the man is charged with first-degree murder, and the presumption is that we had sufficient evidence at the time for the District Attorney to file a complaint.

"By the Court: I think so. That is the presumption.

"By Mr. Bonner: I don't think it is, Your Honor.

"By the Court: It is rebuttable. You can rebut it. The presumption, as it stands before this Court, is that he was charged with murder and there is sufficient evidence to bring the defendant to trial for murder."

Then, after further colloquy between the respective counsel and the court as to whether the deputy district attorney would consent to bail, and whether, if he did so, it would make any difference as far as the court was concerned, the court thereupon said to Mr. Bonner: "I think you should make your motion and submit your argument," and Mr. Bonner proceeded with his argument. There had been no formal offer or admission of the transcript in evidence, nor any formal renewal by Mr. Bonner of the objection to certain evidence, which he had made before the coroner at the inquest; but, as before stated, the court had read the evidence in the transcript, and presumably Mr. Bonner's objection which appeared therein were observed by the court. As the argument proceeded, Mr. Bonner strongly urged his client's right to bail—arguing, in effect, that there was no competent evidence in the transcript upon which could be predicated a conclusion that the proof of first-degree murder was evident, or the presumption of guilt thereof great, and stressed, particularly, Captain Irick's testimony that the deceased had stated to him that the shooting was accidental. But the court then referred to the testimony of "the lady," and indicated reliance upon it. Mr. Bonner, thereupon, pointed out to the court that she did not testify—that the coroner sustained his objection to her testimony because she was the common-law wife

of the defendant. The court thereupon insisted that common-law marriages are not recognized in Nevada, but changed his mind and ruled differently at the trial in regard to Mrs. Teeter's evidence. Mr. Bonner pointed out that the coroner had, over his objection, allowed Sergeant Handlon to read into evidence at the inquest an unsworn statement by Mrs. Teeter, the same common-law wife (which statement the court was then considering·in connection with the application for bail), and that the same was objectionable as being hearsay. Mr. Bonner strongly urged his contention, but the court took the view, in substance and effect, that Mr. Bonner, by having the court read the testimony, had waived all objections to it, or any part thereof. Mr. Bonner stated that the evidence was incompetent, and that he had not thought the court would consider "immaterial testimony," and urged the court to disregard the incompetent evidence, and, inasmuch as all the *competent* evidence tended to establish that the shooting of the deceased was an accident, the defendant was entitled to his constitutional right of bail. Judge Henderson persisted in his view, and denied bail. This was error.

█ In England, there being no written constitution and bail not being a matter of constitutional right, but dependent upon statute, or the rules or practices of courts, the indulgence in presumptions upon the basis of an indictment or other criminal charge could more reasonably be deemed permissible than in the states of our American union. In most of these, including Nevada, as has been elsewhere stated, the right to bail is commanded by the constitution, and hence is an absolute constitutional right, even in capital cases, unless the proof is evident or the presumption of guilt great. This exception, permitting bail to be denied, is based entirely upon the *factual* proposition of whether or not the proof is evident or the presumption of guilt, arising from the evidential proof, is great. If the constitutional framers had intended that bail be denied upon a criminal charge

merely upon the basis of an indictment found by a grand jury or an information filed by a prosecuting attorney, instead of upon a basis of actual facts, namely, evident proof of guilt, they would have so stated. This basis of fact upon which the right, or the absence of the right, to bail depends, should, of course, be determined, as any other important fact is determined, by sound evidential principles or rules, which means upon competent evidence complying with such rules of evidence as have general judicial sanction.

The writer of this opinion has been much concerned with the question of the effect of the erroneous denial of bail in the instant case, and has determined that it does substantially affect the validity of the judgment. To what extent it affects the judgment, or whether standing alone it would require a reversal thereof, it is unnecessary to determine. It so affects the judgment, we believe, for the following reasons:

1. It operated to curtail and restrict, as counsel for defendant has urged, the opportunity of defendant to prepare properly for trial.

2. A defendant, if he appears for trial as a prisoner in the custody of officers, is in a less favorable position than a defendant on bail. He is not only handicapped by embarrassment and humiliation, but there is some probability, at least, that that sort of appearance may make an unfavorable impression upon the jurors, to which risk one clearly entitled to bail, as was defendant here, should not be required to be subjected, until his guilt has been proved.

3. There is also the probability that denial of bail, published in the newspapers as was done in the instant case, may make upon the public mind generally an impression that the state's case against defendant is strong, or bail would have been allowed—that is, that the proof must be evident and the presumption great of his guilt—and that such impression may infiltrate into the mental consciousness of jurors.

■■ There is nothing we can do to aid the defendant toward favorable consideration of any future application for bail. *After conviction,* under our statute, admission to bail is entirely discretionary with the court or magistrate hearing such application. Futhermore, we have no means of knowing what evidence may be offered by the state in opposition to a new application.

In addition, under our law, upon the reversal of a judgment of conviction of murder in the second degree and of the order denying a new trial, the fact of such conviction of the lesser degree of the crime does not operate as an acquittal of the higher degree, as it would in Louisiana, Florida and some other states. Under our statute, N.C.L.1929, vol. 5, sec. 11030, if we should order a new trial and remand for that purpose, such action places the parties in the same condition as if no trial had been had. Consequently upon a future application for bail, if the state should offer sufficient evidence to establish satisfactorily that the proof is evident or the presumption great that the defendant is guilty of first-degree murder, he would not be entitled to bail; or if the state did not show sufficiently the proof to be evident or the presumption great, the fact remains that after conviction of second-degree murder the allowance of bail would be a matter entirely in the discretion of the court or magistrate to whom such application is made. Such discretion, however, should be a sound, legal discretion, and the court or magistrate, upon such application, should give due consideration (according to many authorities) to the fact that at the former trial the conviction was only in the second degree.

The second assignment of error is: "That the trial Court erred in denying appellant's motion for a change of venue."

■ While from the standpoint of idealistic perfection it would have been better in the instant case, perhaps, as it would doubtless have been in many cases tried in the counties where other crimes have occurred, and in which the defendant is accused, to a greater or

lesser degree, of participation in, or connection with, some crime other than that with which he is charged, if the trial could be far removed from the scene of the crime, where there have been newspaper articles and rumors concerning it, or concerning some other crime which has been committed and with which the defendant is suspected of having some connection. Nevertheless, we do not believe the record in the instant case shows an abuse of discretion on the part of the district court in denying a change of venue. Our statute, N.C.L. 1929, vol. 5, sec. 10948, provides that "no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public press, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such an opinion, act impartially and fairly upon the matters submitted to him." If jurors are not necessarily disqualified because of qualified opinions formed as the result of public rumor, statements in the public press, or common notoriety, it is difficult to perceive how, otherwise than by possible prejudice of jurors, a defendant could be injured by being tried in the county in which the crime is alleged to have been committed, as it is the jurors who play a decisive role in the case. The trial court was correct, I believe, in declining to grant a change of venue until the practical test, that is, whether or not a fair and impartial jury could be had, was applied by the actual examination of jurors on their voir dire. This was done, and it is believed a fair and impartial jury was obtained. The defendant had been, by the court, given the right to renew his motion for a change of venue after determination of such test. The jurors selected apparently were satisfactory to the defendant, or doubtless he would have renewed the motion. Assignment of error No. 2 appears to be without merit.

The third assginment of error is that: "The

Court erred in granting the motion to add names of certain witnesses to the information." The motion was filed February 20, 1947, and on the morning of the trial, February 24, 1947, the court granted the motion, and the names of the witnesses submitted were added and endorsed upon the information. In the notice of motion it was stated that the names of such additional witnesses were not known to the district attorney at the time of filing the information, and were not all discovered until February 13, 1947. Under the applicable statute, sec. 11328, vol. 5, N.C.L.1929, the names of witnesses known to the district attorney at the time of filing the information shall be endorsed thereon, and the names of such other witnesses as may become known to him thereafter and before the trial shall be endorsed upon the information "at such time as the court may, by rule otherwise prescribe." The defendant's attorney having been apprised of the names of the additional witnesses at least three days before trial, such notice conformed to the law, as expounded in State v. Monahan, 50 Nev. 27, 249 P. 566, cited by both the appellant and the respondent. In that case, the motion to add certain names of witnesses was made the morning of the commencement of the trial, and the court granted the motion, but also ordered a continuance of the trial for three days, thus disclosing that the trial court in the Monahan case, and this court in approving such action on appeal, considered three days before trial a reasonable time to enable the defendant and his attorney, or attorneys, properly to prepare for his defense after knowing of the additional witnesses. In the Monahan case, the court, on page 35 of 50 Nev., page 569 of 249 P., stated:

"Upon motion of the defendant, the case was continued for a period of three days to enable the defendant to prepare to meet the testimony of the additional witnesses. If any prejudice resulted from the indorsement, it was cured by the granting of the defendant's motion for a continuance. The weight of authority is

to the effect that under statutes such as ours the indorsement of names of witnesses upon an information is largely a matter of discretion with the court; and, in the absence of a showing of abuse, or that some substantial injury has resulted to the accused, an order permitting such indorsement, even after the trial has commenced, does not constitute of itself reversible error. 16 Corpus Juris, p. 796, § 2027."

No merit appears in assignment of error No. 3.

Assignment of error No. 4, that the court erred in denying defendant's challenge for cause of juror Marva Ray Johnson, appears to have been well taken. From Marva Ray Johnson's answers to certain of the questions upon her examination as a juror, it appears that the preconceived opinion she entertained was more than a qualified opinion. Some of her answers indicated that she could put aside such opinion and decide the case solely upon the evidence and the law as instructed by the court, while other answers on her part indicated that she would have considerable difficulty in doing so. A few of the questions asked and answers of this prospective juror on voir dire will suffice, and were as follows:

"Q. Could you do that? Would you lay aside this opinion which you have now, and proceed on this presumption of innocence? A. (Mrs. Johnson) I would *if the evidence changes it, I guess.* (Emphasis added.)

"The Court Q.: If you were in the position of the defendant being tried by twelve men and women of the same frame of mind as you are now, would you be willing to have twelve men and women try you if the case was reversed? By the witness: Well I don't think now I would want them to hear the case."

In answer to a further question to the same effect, but better formulated and more detailed, she answered, "No, sir." Mrs. Johnson said, also, that her opinion went to the guilt or innocence of the defendant, and that it would require evidence to remove such opinion.

This court believes that in any case it is highly

desirable to have fair and impartial jurors, and to this end, in view of the newspaper articles which had been published concerning the case, and the prevalence of much rumor and gossip concerning it, in Clark County, that the court and counsel for the state should have been scrupulously careful in selecting the jurors, and that no juror whose answers indicated he or she may have come in contact with such articles or remarks and had formed an opinion, or opinions, which it would be difficult for him or her to put aside, should have been passed for cause. The court's action in passing Mrs. Johnson for cause in spite of the objection of the defense necessitated that the defendant use one of his peremptory challenges in excusing her. We have no means of knowing whether or not the defendant later needed this challenge for use in excusing some other juror, although the fact that he used all of his peremptory challenges would indicate that he may have been dissatisfied with some juror whom he was unable to challenge. It appears that the fourth assignment of error has merit.

The fifth assignment of error is that: "The Court erred in allowing the State to examine witness Bernard J. Handlon in such a manner that evidence which tended to show appellant committed the separate and distinct crime of robbery was brought before the jury." This assignment has merit. The record clearly shows that the district attorney, in examining Police Sergeant Handlon, framed his questions in a very general manner, as to what the witness found at the house of the defendant in a second examination of the premises, in which the sergeant participated, on the night following the day of the homicide. The defendant's attorney objected to the form of the questions—that they were entirely too broad, furnishing no indication as to what they related. Shortly after such objection, the record shows the following:

"By Mr. Bonner: If Your Honor please, I see what they are leading up to, and it is absolutely improper. I am going to object to that form of examination. It is going to bring in something prejudicial.

"By the Court: There is nothing before the Court. now.

"Mr. Bonner: Yes, but there will be no chance for me to object the way he is bringing it out.

"By the Court: You can move to strike. There is nothing before the Court. He said he made a search later that night. Proceed and ask the next question.

"By Mr. Claiborne: Q. What was the result of this search, Sergeant?

"By Mr. Bonner: Object to that as being irrelevant and immaterial.

"By the Court: I think it is too broad. Objection sustained as to the form of the question, as to what the results were. What he found and what the results were are two different things."

Then, after a question as to whether the sergeant found anything relative to the case, and the sustaining of an objection by Mr. Bonner that same called for a conclusion and was leading, and a question asking for the search, to which an objection was sustained, the following occurred:

"By Mr. Claiborne: What did you find as a result of your search?

"By Mr. Bonner: Object to that, if Your Honor please, because what he found would have no bearing on this case.

"By the Court: Objection overruled. It may or may not have. You may move to strike if it doesn't. A. We found a large amount of stolen jewelry from the armed robbery of the Jerry Jerram Store.

"By Mr. Bonner: That is absolutely prejudicial to the jury, and I move it be stricken.

"By the Court: It may be stricken. The jury is admonished not to give any heed as to the word 'stolen,' or as to what he found in that relation.

"By Mr. Bonner: I knew he was trying to get something improper before the jury.

"By Mr. Claiborne: I object to that inference that we are trying to—

"By the Court: The Court has ruled. It may be

stricken, and the jury is admonished not to pay any attention as to that statement made by the witness as to finding jewelry in the premises. The Court had no way of knowing what the answer would be until it was made. The jury is admonished not to pay any attention to that testimony."

To anyone familiar with the background of the case and the surrounding circumstances, to the extent that the presiding judge must have been by the time the above-mentioned stage of the proceedings was reached, it seems apparent that the court, while not knowing in advance precisely what the witness' answer would be, must have known in a general sense, particularly after the insistent warning of counsel for the defendant, or at least surmised, that the answers so energetically sought by the deputy district attorney would probably relate to finding the stolen jewelry from the armed robbery of the Jerry Jerram store. In view of the newspaper articles which had been published, indicating some connection of the defendant with such robbery, and the denial of a change of venue sought by the defendant because of his alleged fear, and that of his attorneys, that in the public mind and in the minds of possible jurors an impression had been made that defendant was a participant in the robbery itself or the loot obtained therefrom, both the court and the prosecuting attorneys should have been scrupulously careful to exclude from the trial and from the minds of the jurors any and all evidence relating, in any degree, to such robbery, in order to assure the defendant the fair and impartial trial guaranteed to every defendant by the constitution of this state. The deputy district attorney certainly must have known what answer his question would elicit from Sergeant Handlon, and had no right whatever to ask the question which was asked. It is too well settled to require the citation of authority that even if the prosecutor knew that the defendant had connection, as an accessory after the fact or otherwise, with

the jewelry store robbery, same would constitute evidence of an offense other than that for which the defendant was on trial, and was inadmissible in view of the then state of the record, and highly prejudicial to the defendant. State v. McFarlin, 41 Nev. 486, 172 P. 371. Unless a proper foundation is laid showing such testimony tends to show intent, motive, or that the several offenses are part of a general plan or scheme, or that they are part of the res gestae, such testimony is not admissible. State v. Salgado, 38 Nev. 64, 145 P. 919, 150 P. 764; State v. White, 52 Nev. 235, 285 P. 503.

The court, when warned by counsel for the defendant, could readily have avoided error by calling the respective counsel into conference and inquiring as to what evidence the state sought to elicit by the question. It would then have become instantly apparent that the objection to the question should be sustained. Mr. Bonner was right in stating in his opening brief, on pages 16 and 17, the following:

"Even though appellant's motion to strike the said evidence was granted appellant suffered prejudicial injury to his case by allowing the said statements to go to the jury.

"A careful examination of the said transcript of said witness will disclose that the state attorney knowing of course that the witness would so testify deliberately framed his questions in the manner he did to get this prejudicial matter before the jury. Even though appellant constantly called the court's attention to the improper mode of examining said witness the court allowed him to continue until the damage had been done."

The error in allowing such answer and the damaging evidence to be heard by the jury was not cured, in my opinion, by admonishing the jury to disregard it. The human mind is not so constituted that an impression once made can be totally obliterated, in the minds of all jurors, by an instruction to disregard it. I believe the

error was prejudicial, especially so in view of the widespread publicity tending to connect the defendant with the robbery.

The sixth assignment of error is that: "The Court erred in allowing Capt. Sam Irick to testify as to certain extra judicial statements allegedly made by appellant over latter's objection." Such objection being predicated upon the contention that the extrajudicial statements to which such sixth assignment of error is directed were admitted over defendant's objection, at a time when the corpus delicti had not been sufficiently established. For the definition and essential elements of the corpus delicti, reference is made to Wharton's Criminal Evidence, eleventh edition, vol. 1, sec. 208, p. 230, from which the following is quoted:

"Sec. 208. Definition; Essential Elements. The corpus delicti of a crime means the body or the substance of the crime charged. It usually includes two elements: (1) The act; (2) the criminal agency of the act. In homicide, it consists of death as the result and the criminal agency of another as the means. To the corpus delicti, in this sense, it is requisite, first, that it be shown that the deceased died from the effects of a wound; second, that the wound was unlawfully inflicted, and that the defendant was implicated in the crime."

The extrajudicial statement made by defendant to Capt. Irick and admitted in evidence, and to which assignment of error No. 6 is directed, was as follows:

"I then asked Freddie Teeter what had happened, and he had told me a man had been shot, and I said, 'Who shot him?' He said, 'It was an accident.' "

At the time the foregoing statement was admitted, the testimony had proceeded only to the point that Dr. Sylvain and Dr. Cherry had been examined, and a portion of Capt. Irick's testimony had been taken. From the testimony of the two physicians it was definitely established that Mr. Linabury, suffering from a gunshot wound, had been brought to the Las Vegas hospital, was treated there for three days by Dr. Sylvain, and was

then removed to the Clark County hospital and there treated by Dr. Cherry for about two days, whereupon he died, and that his death was caused by such gunshot wound. But the only evidence that the wound was not self-inflicted, but was caused by the criminal agency of another, was the opinion of Dr. Cherry that the hole made by the bullet in the front part of the chest "appeared to be a little larger than the one in the back." At another point in his testimony, the doctor, in answer to a question by the district attorney as to whether he had "an opinion as to which wound on Howard Linabury represented the entrance wound of the bullet and which wound represented the exit of the bullet," stated:

"A. I didn't see this patient immediately after he was shot. It was several days before he was transferred to the Clark County General Hospital, and as near as I could determine, there was a *possibility* that it was the hole in the back which was what I would consider mainly a clean cut hole, and the hole in front—the skin maybe had a slight tendency to being stretched or torn a slight amount, which would lead me to believe that the exit of the bullet was in front." (Emphasis added.)

On cross-examination, Dr. Cherry stated, among other things, that:

"It was difficult to state the difference in size. If any, the one in front possibly was slightly larger than the hole in back, but as I stated, it was several days after this man was shot when he was referred to me. * * * The reason I stated that possibly the bullet wound might have entered from the back was that the bullet wound in front on his chest had the appearance of being a little larger, which you get with an exit of a bullet. To state this exactly, that it entered the back and came out the chest, is difficult to state because of the lapse of time since the man was shot."

"Q. (By Mr. Bonner): As a matter of fact, then, Doctor, it could have entered from the chest as from the back, actually, as far as you positively know? A. I could not state that it did not enter from the chest."

After further questions, Dr. Cherry stated:

"A. As I stated before, my reason for having the opinion that it could have entered the back and came out the front was because the front hole appeared to be a little larger than the one in the back."

Dr. Cherry's testimony constituted some evidence that the bullet probably entered in the back, but it is clear he was, by no means, certain. His opinion was based solely upon the fact that "the front hole appeared to be a little larger."

If the bullet entered in the back, it is improbable that the injured man shot himself. This idea is stressed by counsel for the state, and is sound. The extrajudicial statement, while disclosing that the defendant had some knowledge of the shooting (his said statement to Capt. Irick being to the effect that a man had been shot), did not disclose that he, Teeter, did the shooting. In reply to Capt. Irick's question, "Who shot him?" the defendant answered, "It was an accident." It would seem, therefore, that although the sufficiency of the foundation was questionable, the admission of said statement, if erroneous, did not constitute prejudicial error.

The seventh assignment of error is that:

"The Court erred in allowing Bernard J. Handlon to testify as to certain extra-judicial statements of appellant and overruled the latter's objections." As to this assignment, it may be stated that before the statement by the defendant to Sergeant Handlon was admitted the relevant evidence in the record consisted of not only the testimony of Doctors Sylvain and Cherry, but that of Capt. Irick, Johnnie Teeter and Lee Taylor. Johnnie Teeter had testified, in substance, that he was sleeping in the bedroom, and Linabury awakened him and exclaimed, "I am shot." It appears that this exclamation indicated shocked surprise and desire for assistance. In view of the fact that these men were close friends, it would seem reasonable that if Linabury had shot himself he would have expected the result, and if he changed his mind and desired help, that he would have said something to indicate to his friend, Johnnie Teeter, that he

had attempted suicide. This is corroborative of the testimony of Dr. Cherry, which tended to establish that Linabury was shot in the back, and the circumstantial inference resulting therefrom that he did not shoot himself. The evidence indicated strongly the probability that the wound was not self-inflicted, but was produced by the criminal agency of another. Upon Johnnie Teeter having testified as above indicated, then the prior testimony of Capt. Irick that he found the gun on a coffee table in front of a davenport in the living room at the home of the defendant, upon Irick's visit on the afternoon of the shooting, became important in the further establishment of the corpus delicti, in that the gun was subsequently identified as belonging to the defendant. That certain elements of the corpus delicti may be strengthened or corroborated by later testimony, see: Wharton's Criminal Evidence, eleventh edition, vol. 1, sec. 210, p. 235; Carl v. State, 125 Ala. 89, 28 So. 505; Holland v. State, 39 Fla. 178, 22 So. 298.

Furthermore, the testimony of Lee Taylor, who was called from the hospital and came with the ambulance shortly before the arrival of Capt. Irick, to the effect that the only persons present at the Teeter home when he arrived were Freddie Teeter and his wife, that Freddie Teeter was in the front room, and there was a lady in the room where the injured man was lying who was subsequently identified to the witness as Florence Teeter, tended to connect the defendant, circumstantially, with the shooting, as did the testimony of Capt. Irick as to the same persons being present when he arrived at the Teeter home shortly after Taylor, and on the afternoon of, and shortly after, the shooting. Capt. Irick testified that Fred Teeter had met him at the front door, and Teeter's wife later entered the room hilariously and tried to grab the gun, but the captain pushed her back and took possession of it.

■ It is clear that, prior to the admission in evidence of the extrajudicial statement made by the defendant to Sergeant Handlon the corpus delicti had been sufficiently established.

The eighth assignment of error is that: "The Court erred in refusing to allow Capt. Sam Irick to testify as to dying declaration made by deceased." The respondent has conceded in its brief that the dying declaration concerning which Capt. Irick would have testified if permitted by the court was the statement made to Capt. Irick by the deceased, Linabury, at the Las Vegas hospital at approximately five o'clock in the evening of November 24, 1946, the date upon which Linabury was shot, and which was testified to at the coroner's inquest by Capt. Irick, on December 11, 1946. The pertinent portion of Capt. Irick's testimony upon that point is as follows:

"I asked Mr. Linabury what had happened and he said there had been an accident—that he was shot accidentally. Then upon examination, I found a bullet wound in the center of the upper part of the chest the same as Dr. Sylvain testified."

On cross-examination, Capt. Irick testified that present at the conversation, and at the time the foregoing statement was made, were: Dr. Sylvain and two nurses assisting him, whose names the captain did not have, that those were the only ones present—that Sergeant Handlon had proceeded to the home. Asked by Mr. Jones, district attorney, "What did Mr. Linabury say?" Capt. Irick answered: "He told me that there had been an accident and that he had been accidentally shot." Defendant's attorney, at the trial, called Capt. Irick as a defense witness, and made an earnest and persistent effort to have the foregoing statement of the deceased, Linabury, admitted in evidence as a dying declaration. Mr. Bonner endeavored to lay the proper foundation. Repeated objections were made by Mr. Claiborne, deputy district attorney, to Mr. Bonner's questions, and, almost invariably, they were sustained. Some of the rulings were correct, but the court repeatedly sustained objections to questions of defendant's counsel upon the ground that no sufficient foundation had been laid, and, at the end of that phase of the case, that no foundation had

been laid. The court, at no stage of the proceedings, pointed out wherein the foundation was insufficient, whether because the court deemed the opinion of expert witnesses, for instance physicians, as to Mr. Linabury's physical condition or as to the fact of whether or not death was impending, to be the only evidence competent as to such facts, or whether for some other reason the court deemed the foundation insufficient. At one point, after Mr. Bonner had argued earnestly that the dying declaration was very pertinent to defendant, that he believed the court should consider the testimony of Doctors Sylvain and Cherry and of "this witness" (meaning Capt. Irick), in considering whether or not the dying declaration could be introduced, and that he would like very much an opportunity to present it, the court stated:

"This witness—there is nothing before the court. That is all. There is nothing before the court. There is a way to do it. That isn't before the court now."

But the court here, as elsewhere, failed, upon this matter which, it may be readily perceived, was of vital importance to the defense, to indicate the "way to do it," or what sort of evidence the court deemed essential as a predicate for the admission of the dying declaration.

Shortly before the court indulged in the foregoing expressions, and after the witness had testified as to Mr. Linabury's shortness of breath and that he had difficulty in breathing, and after the witness had testified he had made a rather minute and detailed investigation of the deceased's person for three and a half hours, and that the doctors during that time had given the patient intravenous injections, had examined him with a fluoroscope, taken him upstairs, and then put him under oxygen, the witness was asked by Mr. Bonner, "What appeared to be his general condition at that time, *from your observation?*" (emphasis added), and the question was objected to by the district attorney upon the ground that it called for a conclusion of the witness, and no sufficient foundation laid without specifying in

what respect, and the court ruled, merely: "Objection sustained." And soon thereafter Mr. Bonner again asked, "What was his condition at that particular time?" and Mr. Jones again objected, as calling for a conclusion and "no sufficient foundation having been laid for it," and the court thereupon ruled: "Objection sustained." Then Mr. Bonner asked:

"Would you say whether or not the deceased had a feeling he was going to die?"

"By Mr. Jones: We object to that, if Your Honor please. No sufficient foundation laid, and calling for a conclusion of the witness."

"By the Court: Objection sustained."

Then followed what has already been related above, as to Mr. Bonner urging the consideration of the court, due to the importance of the evidence to his client, and the court's expressions, "There is nothing before the court. There is a way to do it. * * *" Thereupon Mr. Bonner further tried to lay a foundation satisfactory to the court. Capt. Irick, the witness, thereupon testified that Mr. Linabury, in his presence, made expressions of pain and suffering, by his voice and the twitching of his arms, that he was groaning, that deceased made no statement that he held out any hope of recovery. This question by Mr. Bonner followed:

"From your observation of his actions, his statements, the groans, and his exclamations of pain, would you say that he had an impending fear of death at that time?"

"By Mr. Jones: We object to that as calling for a conclusion of the witness."

"By the Court: Objection sustained."

The question, of course, called for an opinion or conclusion. The question was, and is, whether or not such opinion by a layman, a captain of police, who had observed Linabury's condition for three and a half hours while the doctors and nurses were working with the patient, and who had testified in detail as to exclamations of pain, shortness of breath, groaning, twitching, his weakness of voice, the nature of his wounds in back

and front, etc., was competent to say whether or not Linabury believed death was impending. The authorities appear to justify the admission of the opinion testimony of a layman who has had full opportunity to observe, and has observed, the injured person, his symptoms, words, expressions and exclamations, as to the general physical condition, and his opinion as to whether the injured person believed death to be imminent or impending. See People v. Sanchez, 24 Cal. 17, referred to in Wharton's Criminal Evidence, eleventh edition, vol. 1, sec. 563, page 922, footnote 1, wherein it is stated:

"That hope had fled, and an injured person had not the slightest expectation of recovery, may be shown by any circumstances of the case taken together, such as the character of his wounds, his sufferings and pain, the opinion of the surgeon and *other attendants* as to his condition * * *." (Emphasis added.)

In State v. Elliott, 45 Iowa 486, referred to in said vol. 1 of Wharton's Criminal Evidence, sec. 504, page 928, in footnote 5, it is stated:

"The circumstances under which the declarations were made are to be proved to the judge, and he will hear all things that the deceased has said relative to his situation and will inquire into the, *state of illness* in which he was; the opinions of medical and *other persons* as to this state, and whether they were made known to the deceased * * *," citing the following English cases: Rex v. Van Butchell, 3 Car. & P. 629, 172 Eng. Reprint, 576 Hullock, B.; Rex v. Spilsbury, 7 Car. & P. 187, 173 Eng.Reprint, 82 (Coleridge, J.). (Emphasis added.)

■ It was error to sustain the objections and not to permit Capt. Irick to testify as to the general condition of Linabury and to state his opinion as to whether or not Linabury believed, at the time of making the declaration in question, that death was impending.

■ Furthermore, according to the weight of authority, it was error for the court to permit the examination in laying the predicate for admission of the declaration

to be conducted in the presence of the jury. The deputy district attorney, Mr. Claiborne, suggested to the court, early in the examination of Capt. Irick, that the jury be excused until such time as the laying of the foundation had been completed and the court had ruled as to the admissibility or inadmissibility of the declaration. This rule is to prevent the jury being influenced by the declaration, if found not admissible, and, also, to prevent undue prejudice against the defendant caused by an adverse ruling of the court when admissibility is being determined. See Wharton's Criminal Evidence, eleventh edition, vol. 1, sec. 564, pages 924, 925, particularly the cases cited in the footnotes.

After the court's rulings repeatedly sustained the objections without indicating what kind of foundation would satisfy, Mr. Bonner requested a recess, stating:

"This witness is very valuable to our case. I would like to examine more authorities to bring out the evidence, which Your Honor feels is necessary. I don't know what it is. It requires a little research."

Mr. Jones objected to any recess, upon the ground of the recess the day before to accommodate counsel for defendant. The court then called attention to the recess of the day previous, for the purpose of allowing Mr. Bonner to prepare for the defense, "on the ground that the prosecution stopped rather suddenly. I thought it was only fair. I don't think you should have any more recess. You will proceed."

"By Mr. Bonner: Is the Court still of the opinion that insufficient foundation is laid for a declaration?

"By the Court: I don't think any foundation has been laid for a declaration." (Still not indicating in what respect, or why.)

■ Here was defendant's counsel seeking a recess to consult authorities before final disposition of one of the most important elements or questions involved in the defense of his client, namely, the admission of a declaration which, if competent and believed true by the jury, might have a decisive effect in the case. In view of the

prior rulings of the court, repeatedly holding the foundation established by the defense insufficient, and excluding important portions of Capt. Irick's testimony (with which we do not agree, as will be hereinafter disclosed), counsel for defendant doubtless was taken by surprise. The recess was requested on the fourth day of a trial in a case in which the defendant was charged with murder, which might involve the death penalty. Such cases, in many places and courts, require weeks—sometimes months—for trial. We see no reason for such haste. What is said in Wharton's Criminal Evidence, eleventh edition, vol. 1, sec. 564, p. 928, in relation to allowing a defendant time to test the competency of a dying declaration against him, is equally applicable to the situation of a defendant desiring to show the competency of a dying declaration in his favor. The learned author there stated:

"The argument of inconvenience and prolongation of trial has no place in a homicide charge. It is the solemn duty, devolving upon the entire tribunal, to hear with patience and deliberation, and to decide dispassionately and impartially, without regarding the length of time that may be required to do justice."

Now consideration will be given to the question of what is a sufficient predicate or foundation for the admission of a dying declaration. The principal essential is the belief by the declarant, when he makes the declaration, that he is in extremis, or that death is impending. In the matter of such a declaration caution must be employed to be certain, so far as possible, in the absence of the solemnity and sanctity of an oath and the valuable test of cross-examination, that there is reasonable assurance of the truthfulness of the declaration. In view of necessity in many cases, when other evidence is unavailable or uncertain as to important facts, such declarations have been admitted in evidence, provided there is the consciousness and firm belief in the mind of the declarant that death is inevitable and impending, and that he must soon be face to face with that Divine

Power to whom he owes his existence, and whom most persons in some form or manner, regardless of religious sect, denomination or creed, or of race or nationality, recognize as loving truth and abhorring falsehood. What foundation is required, therefore, to render such a declaration admissible? How can courts, employing such prudent caution as sound discretion dictates, be assured that the declarant, when making his statement or declaration, believed that death was near? The authorities, very generally, hold that for a court properly to conclude that the declarant making the statement believed death was impending, it is not necessary for the declarant to state to anyone, expressly, that he knows or believes he is going to die, or that death is certain or near, or to indulge in any like expression; nor is it deemed essential that his physician, or anyone else, state to the injured person that he will probably die as a result of his wounds, or that they employ any similar expression. It is sufficient if the wounds are of such a nature that the usual or probable effect upon the average person so injured would be mortal; and that such probable mortal effect is not hidden, but, from experience in like cases, it may be reasonably concluded that such probable effect has revealed itself upon the human consciousness of the wounded person, so that he knows, or strongly believes, that death impends. Wharton's Criminal Evidence, eleventh edition, sec. 530, pp. 852–854, and the many cases cited.

What did Dr. Sylvain find or believe as to Mr. Linabury's condition on the day he was brought to the Las Vegas hospital? It was on that evening that Linabury made the declaration in question to Capt. Irick. Dr. Sylvain, asked, as a witness, what Linabury's condition was when he was brought to the hospital (about 4 p. m., November 24, 1946, the doctor had testified), answered:

"This individual was in a critical condition, at the time that I saw him. He was suffering from a penetrating wound of the chest. His clothes were saturated with

blood. He was in extreme shock from injury and hemorrhage."

Other parts of the doctor's testimony disclosed that the bullet had penetrated Linabury's body, with its point of entrance on the right side of the back part of the chest, and the point of exit being in the front part of the chest at about the level of the third rib, or vice versa. Capt. Irick testified Linabury was very short of breath, and called attention to his difficulty in breathing—that he was groaning; that he was gasping—"very short gasps of breath, very gasping," also that his voice was weak and that he could barely talk, and that his arms were twitching. The said witness testified that he saw bullet holes in the front and the back. Dr. Cherry, who attended Linabury the last two days of his life, commenced his services nearly three days after the declaration in question was made, and, consequently, his testimony is not as important as that of Dr. Sylvain, or that of Capt. Irick, but very corroborative of the mortal character of Linabury's injury, and the probability that the injured man himself, at all times after the wound was inflicted, so realized. Linabury was brought to the Clark County hospital about 4:30 p. m. on November 27, 1946, and Dr. Cherry examined him at that time. Asked by Mr. Jones what he then found Linabury's condition to be, the doctor stated:

"The man apparently was in shock. His condition was very unfavorable, and the pulse was rapid and weak. I also found he was suffering from a gunshot wound, which Dr. Sylvain had previously explained to me * * *. There was a bullet wound that entered the right side of the chest, passing completely through the right side of the chest. This man was having difficulty breathing and was running considerable temperature."

Further on in his testimony, Dr. Cherry stated that "we gave him large doses of penicillin, he had glucose solution, he had plasma, and later he was under an oxygen tent." And that he died while in the Clark

County hospital, at 4:30 p. m., November 29, 1946. This was almost exactly five days from the time he was injured, at about 4 p. m., November 24, 1946.

Reference is now made to the very able and scholarly opinion of Mr. Justice McCARRAN in State v. Scott, 37 Nev. 412, 142 P. 1053. On pages 429, 430, of 37 Nev., page 1059 of 142 P., the learned justice stated:

"The question whether the alleged dying declarations were made under such circumstances as to render them admissible in evidence was in the first instance to be determined by the court upon the preliminary proof or predicate for their admission. All that was required to let the statements go to the jury was the making of a prima facie case that the utterances were made by the declarant when he was in extremis, and when he was fully conscious of that condition. However this may be, the ultimate facts and the weight, credence, and significance to be given to the statement when admitted is for the jury, and it is error to remove this question from their consideration. People v. Thomson, 145 Cal. 717, 79 P. 435; State v. Hendricks, 172 Mo. 654, 73 S.W. 194; 21 Cyc. 987."

██ ██ Many other authorities have held that it is for the court, and not for the jury, definitely to determine the fact of whether or not the declarant made the declaration when in extremis, or when he was conscious of impending death. In Wharton's Criminal Evidence, eleventh edition, vol. 1, sec. 564, p. 924, it is stated: "The relevancy and admissibility of dying declarations are questions solely for the court," citing cases from Kansas, Missouri, Texas, Kentucky, and Mississippi. We are bound, however, by the majority decision in State v. Scott, supra, and shall adhere to that doctrine. Applying that doctrine to the facts in the instant case, no hesitancy is felt in saying, and holding, that it was sufficiently established by the evidence that the statement of Linabury to Capt. Irick, and which was not admitted by the trial court, was "made by the declarant

when he was in extremis, and when he was fully conscious of that condition." (The quoted words are from the able opinion of Mr. Justice McCarran.)

The one remaining objection to the admission of the dying declaration is that it is inadmissible because, as is contended, it is the expression of deceased's opinion that the shooting was accidental, and was not the statement of a fact. The rule is stated in Wharton's Criminal Evidence, eleventh edition, vol. 1, sec. 538, pp. 869, 870, as follows:

"Sec. 538.—When Statement Favorable to Accused. Mere expressions of opinion are not admissible, even though they are in favor of the accused. Hence, where the declarant stated that the wound was an accident, or that the accused did not intend to hurt him, or that it was declarant's fault, or that accused was crazy, it was expression of opinion, and inadmissible. But some courts have made an exception to the rule that declarations of the deceased are admissible only when they relate to facts, and not to mere matters of opinion, and have held declarations of opinion admissible where they are favorable to the accused, and explain the conduct or motives of the deceased, or show his feelings or belief."

In sec. 553, pp. 905, 906, of the same volume, is the following:

"It is said in an English case (citing Rex v. Scaife, 1 Moody & R. 551, 174 Eng.Reprint, 190, 2 Lewin, C.C. 150, 168 Eng.Reprint, 110) that a declaration in favor of the accused must ever be taken as more likely to be true, as it is not probable that one would make a statement favorable to the person who has inflicted a mortal injury upon him; but rather the contrary. The general rule that dying declarations speak only to the facts, and not to matters of opinion, has been relaxed where the opinion expressed by the deceased was favorable to the accused, in explanation of the conduct of the deceased, and hence the declaration that the accused would not have struck the deceased if the latter had not provoked

him is competent, as also the direct declaration by the deceased showing that the killing was done by another person."

In support of the rule that the rules of evidence are not to be so rigorously applied when the fact satisfactorily appears that the declaration favors the accused, see: Haney v. Com., 5 Ky.Law Rep, 203; State v. Ashworth, 50 La.Ann. 94, 23 So. 270.

A test frequently applied, and which goes to the nature of the opinion itself, to determine its admissibility, is stated in House v. State, 94 Miss. 107, 48 So. 3, 5, 21 L.R.A., N.S., 840, as follows:

"To us the true and proper test as to admissibility is whether the statement is the direct result of observation through the declarant's senses, or comes from a course of reasoning from collateral facts. If the former, it is admissible; if the latter, it is inadmissible."

This test is referred to in respondent's answering brief, p. 59, and 40 C.J.S., Homicide, sec. 299, p. 1278, is cited.

A statement that defendant shot "for nothing" has been held inadmissible, as clearly an expression of opinion based upon collateral facts. Collins v. Com., 12 Bush, Ky., 271. "He shot me just because he could" has been held a mere expression of opinion. Cavanaugh v. Com., 172 Ky. 799, 190 S.W. 123, 128. Likewise, the statement by a declaration that defendant and others had "met him down there to kill him without a cause, and just had it made up with each other to do so." Norwood v. State, 11 Ala.App. 30, 65 So. 851. In State v. Wright, 112 Iowa 436, 84 N.W. 541, it was held that the statement of deceased that he did not *believe* the defendant intended to shoot him was inadmissible because clearly the opinion, as was the statement that declarant thought the defendant was crazy. Also, in State v. Finley, 245 Mo. 465, 150 S.W. 1051, a statement of deceased that he was to blame in bringing on the difficulty was held properly stricken from his dying declaration, on the ground that it was a mere opinion, the

deceased not having recited the acts which he did in bringing on the difficulty. These illustrative cases are collected in the footnotes to sec. 541 of Wharton's Criminal Evidence, eleventh edition, vol. 1, p. 880, and many more cases are referred to in connection with said sec. 541. But all of the above-stated expressions, either because qualified by the language employed, or because not related directly to the act of killing, were clearly predicated upon collateral facts, and were not admissible for that reason. In the instant case, Linabury's declaration was positively stated as a fact, and was to the effect that he was shot accidentally, or that it was an accident. The language used clearly implies that the statement was predicated upon actual knowledge, obtained as a direct result of observation through declarant's senses. And from all the evidence that appears in the record as to that matter, which is the testimony of the defendant to the effect that the deceased had partly turned, and he, defendant, was looking directly at the deceased's face, that conclusion is substantiated.

In Commonwealth v. Matthews, 89 Ky. 287, 12 S.W. 333, on page 334, the court's reasoning on the two major questions involved, which are the same as those confronting us in the instant case, is so closely akin to my own, that I feel constrained to quote from said opinion the following:

"The accused was allowed, over the objection of the commonwealth, to prove, as a dying declaration, what the injured party said after the shooting as to the circumstances of it. It is urged that the proper foundation was not laid for its introduction, and that the statement was in itself incompetent. It was proven that about 15 minutes after he was shot the deceased, when lying upon the ground bleeding and suffering, said that he hoped he would live long enough to take the gun home, and that he died in about 20 minutes. The witness says that he did not say whether he believed he would die or recover, and that he (the witness) did not know whether he was conscious or not when he made the statement.

It is well settled that a statement, to be admissible as a dying declaration, must be made when the party is in extremis, and has given up all hope of this life; but whether this be so or not may be determined, not only by what he may say, but by his evident danger, and all the surrounding circumstances. The injured party need not, in express words, declare that he knows he is about to die, or make use of equivalent language. Peoples v. Com., 88 Ky. 174, 10 S.W. 642. Tested by this rule, we think the statement in this instance was made under a sense of impending death, and that what the injured party then said also shows he was conscious, not only of it, but of what he was saying as to the transaction. The statement, in substance, was that he and the accused were playing, and that it was an accident. To be competent as a dying declaration, the statement must not only relate to the immediate circumstances of the transaction resulting in the injury, but it must detail facts, and not the opinion of the declarant. In our opinion, the statement in this instance conforms to this rule. It is unlike the case where the injured party declared that he had been killed for nothing. This was purely his opinion and inference. Here the injured man said that he and the accused were engaged in play, and that the shooting was an accident. This, in our opinion, was the statement of a fact, more than the giving of an opinion, and the court properly permitted it to be proven."

We cite, also, as pertaining to the subject generally, Hollywood v. State, 19 Wyo. 493, 120 P. 471, 122 P. 588, Ann.Cas. 1913E, 218, and particularly the note on the subject, "Admissibility of opinion of declarant as dying declaration," appended thereto, pages 228–230; Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917; State v. Roberts, 28 Nev. 350, 82 P. 100; State v. Hennessy, 29 Nev. 320, 90 P. 221, 13 Ann.Cas. 1122; State v. Hunter, 48 Nev. 358, 232 P. 778, 235 P. 645.

It is the opinion of this court that, in the instant case,

the testimony of Capt. Irick as to the surrounding circumstances of the dying declaration, offered in the attempt to lay the foundation for the admission of same, and the statement to him by the deceased constituting such declaration, were of great importance to the defendant in his defense, and that their exclusion from evidence was unjust to the defendant, and constituted reversible error.

Appellant's assignment of error No. 9 is that: "The Court erred in refusing to instruct the jury to disregard improper statements of the District Attorney and his deputy in their arguments." The statements of the district attorney and his deputy most complained of were those in which the defendant was characterized, expressly or by implication, as a "hoodlum." The statements of the district attorney containing such designation are as follows:

"Now, who are these people involved in this affair? There is Johnnie Teeter, Don Howard Linabury, and Mr. and Mrs. Teeter. They all came out here from Detroit. They all worked in a gambling hall. It is admitted that they consorted and knew Joe Lark, who is now serving time for robbing a jewelry store. Teeter admits he knew Lark before and got him his job over to the Pioneer Club as a shill. We know this about the defendant, and I think about his associates in that house, including the deceased, Linabury. They came here from Detroit. They were working in a gambling hall. They were friends and consorting with a known robber. In addition to that, we know that the defendant, Teeter, had in his house and that he used a loaded revolver. I think that makes the whole lot of them hoodlums. As long as I am District Attorney of this county, I will do everything in my power to keep these out of the state, hoodlums from coming in here, committing acts of violence, killing each other——."

Objection was made by Mr. Bonner that the above

was improper argument, unjust, and error. The court thereupon stated: "He has a right to draw his own conclusions." Mr. Bonner replied: "That is improper"; then the court said: "I don't think it is. Let the record show——."

"By Mr. Bonner: Let the record show I make exception and I ask the Court and jury to disregard it.

"By the Court: I will not instruct the jury.

"By Mr. Bonner: I take an exception to the remark.

"By the Court: Exception may be noted."

Thereupon Mr. Jones said:

"If Your Honor please, as long as I am a public official in this county, I will do everything in my power to keep hoodlums of the ilk of this defendant out of this county, and if I can get the cooperation of the citizenry, I will make it unpopular to commit such crimes——."

Mr. Bonner then objected to referring to other crimes, and the court stated that the district attorney had the right to draw conclusions in argument. Mr. Bonner replied to the court: "He doesn't have the right to comment on other crimes. There are no other crimes showing"; whereupon, Mr. Jones stated:

"I am not trying this defendant with any other crime than what he is charged with before this court. That there might be no mistake, I think there is nothing in this record that he was definitely indicated or implicated in the Jerry Jerram robbery. I don't say he was. I do say, however, and it is my conclusion and opinion from the evidence that he knew that immediately after——

"By Mr. Bonner: I object to any reference to that robbery as not in issue, not in evidence.

"By Mr. Jones: After it was committed, had been committed, and who committed it.

"By the Court: That is in the evidence.

"By Mr. Jones: The defendant himself brought it into the evidence. * * *"

The district attorney was in error, at that point, in stating that the defendant brought the jewelry robbery,

or the fact of any knowledge thereof by the defendant immediately after it was committed, into the evidence. The record clearly shows that, except for the conversation between the defendant and the deceased on Sunday, November 24, 1946, the day of the homicide, in connection with which the defendant testified, in effect, that Linabury, upon the defendant's inquiring where he got certain jewelry displayed upon that occasion, told him Joe Lark gave it to him, and that it all came about from a key which he, Linabury, had given to Joe Lark, the key to defendant's front door, and that he came to defendant's house, "unbeknowing" to defendant, the day of the holdup, after Linabury's giving him the defendant's key, got defendant's gun out of its drawer, and went and held up Jerry Jerram's store—the defendant had not brought in any evidence relating to such robbery, or to the visit of Joe Lark to defendant's house on Thursday, November 21, 1946, the day of the hold-up, nor the fact of Joe Lark bringing certain sacks to defendant's home. Evidence to that visit of Joe Lark, and what occurred there between Lark and the defendant, was first brought into the evidence by the district attorney in cross-examination of the defendant. Defendant's attorney objected as soon as that line of questioning began, but immediately thereafter withdrew his objection. I can only surmise that he did so because he feared the effect on the jury of the answer of Sergeant Handlon earlier in the case, and which had been stricken and the jury admonished to disregard it. Defendant's attorney, in view of that situation, may have thought it better to permit his client to state fully what occurred between defendant and Lark on the day of the robbery, lest the jurors might believe the defendant was implicated in the robbery, or became implicated, through Lark, upon the occasion of Lark's visit to defendant, in the fruits of the robbery. In any event, the defendant denied positively, in his testimony, that he saw any jewelry in the bags or sacks which Lark had

with him in defendant's house at the time of said visit, which was shortly after the robbery occurred. The record, in that connection, discloses the following:

"Q. (By Mr. Jones): Did he have some jewelry with him at that time? A. I don't know. I didn't see it.

"Q. Didn't you tell Joe Lark to 'put that stuff in your bag and get out of here?' A. No, sir, I told him to take his bags and get out. He had some bags on the kitchen table.

"Q. Was he perspiring and shaking at that time? A. Yes, he was. (Reporter's transcript, p. 213.)

\* \* \* \* \* \* \*

"Q. Did you notice at that time two maroon colored watch boxes, one ivory velvet ring box, and one small maroon box in the room? A. If you will permit me—

"Q. Did you or did you not see that stuff? A. No.

"Q. Did you see two brown paper bags approximately half full in the house at that time? A. I saw two brown paper bags. (Reporter's transcript, p. 214.)

\* \* \* \* \* \* \*

"Q. As a matter of fact, Mr. Teeter, at the time you had this conversation with Linabury, the deceased, in your house about three-thirty the day of this shooting, November 24, 1946, you had known for three days at that time about the Jerry Jerram jewelry robbery, had you not? A. It was read in the newspapers, but as far as knowing who did it, I didn't know.

Q. You didn't know Joe Lark—A. "I had no idea or I would have called the police."

It seems proper to state at this point that there is no evidence whatever in the record which justified the inference or conclusion indulged by the district attorney to the effect that the defendant knew immediately after the robbery was committed that it had been committed and who committed it. There was no evidence upon that phase of the case other than the defendant's testimony.

The mere fact that Joe Lark brought bags or sacks into defendant's house, even if they appeared to contain something, affords no basis for an inference that the

defendant looked into the bags or sacks, even if they were open or partly open, in the absence of any evidence, direct or circumstantial, that he did so, or was standing or sitting in such a position as would have enabled him to have looked into them, and in the absence of any admission on his part that he did so, and the defendant having positively testified that he did not see what was in the bags or sacks. It appears reasonable to believe that one in Joe Lark's situation, having shortly before committed a robbery, would have had the bags closed, to prevent detection of the crime. Neither was there any evidence which would justify the inference that when Joe Lark departed, at the defendant's command, he left the bags, containing the jewelry, in defendant's house, and that defendant, if he had not learned of the robbery by seeing the jewelry while Joe Lark was present, possibly learned of it soon after Lark left, by inspecting the bags, and that, so learning of it, he failed to report it to the police. Again, there is as much, or more, reason to infer, if any inference upon that fact is proper at all, that, because Joe Lark was ordered by defendant to take the bags and get out, he probably obeyed to the extent of taking the bags with him. One circumstance indicating such a presumption would be that a man who had gone to the extreme of committing robbery, with its attendant risks, to obtain the jewelry, would probably not walk away and leave it, unless forced to do so. On the other hand, it could have been that Joe Lark was so frightened that the police would find him with the loot that he might have abandoned it and left same in defendant's house, even though ordered by defendant to take it with him. But the basis for such an inference is no more substantial, if as much so, as the opposite inference above mentioned. It is not believed, therefore, that an inference either way is justified, from the evidence. So, considering all possible inferences, where in the record is there any evidential basis for the inference or conclusion of the district attorney that Teeter knew immediately after the robbery that it had

been committed, and who committed it? And yet such inference or conclusion is the only justification the district attorney expressed when objection was made by defendant's counsel by calling the defendant a "hoodlum," and request made to the court to admonish the jury to disregard such characterization, and which the court declined to do.

Mr. Claiborne, deputy district attorney, evidently upon the basis of a similar conclusion or inference on his part, in the closing argument, stated:

"Now, isn't that a little inconsistent? Here is a man he knew as his friend, he had worked with him, who used to come to his house, we will say occasionally, Mr. Bonner, for breakfast, and all of a sudden the defendant Freddie Teeter comes into the house and can give as his only reason for telling him to leave that he had no business there, but he saw those sacks. I submit to you ladies and gentlemen my opinion of that. *He knew then and there that Joe Lark had committed a robbery, and he had the loot, the jewelry, in those sacks, and he told him to leave.*" (Emphasis added.)

Mr. Bonner then objected, "that is not a fair or reasonable inference." Mr. Claiborne replied: "That is my conclusion"; then Mr. Bonner said: "He is not supposed to give conclusions on anything which might cast a reflection on another crime. I move the jury be instructed to disregard that statement as being prejudicial"; whereupon the court stated: "He has a right to draw conclusions," and Mr. Bonner commented: "Not unless it is a fair inference from the testimony," and the court then made its ruling: "Objection overruled."

After considerable further argument, Mr. Claiborne made an impassioned, emotional appeal to the jury, a portion of which, together with the defendant's objections and the court's remarks, was as follows:

"I want to call your attention to, and I am glad Mr. Bonner brought it up—he said we have just fought a war for democracy in order that an innocent man would not be tried for crimes he did not commit. I don't

know whether Mr. Bonner participated in this war or not, this last war. I did, five years of it. I am glad he mentioned that we had fought a war for democracy, and when I say that, I speak of thousands of soldier boys all over this country, millions of them, so to speak. We fought a war to rid the country, the whole world of international hoodlums, and those who would violate the international code of man and mankind. Having participated in what I thought then was that mission, and still believe so, I appreciate those words, and I am trying to do today, Mr. Bonner, the very same thing which you say we did, but I am trying to bring it home to Las Vegas, and as a young man admitted to this Bar, I give you my solemn oath before you and God that I will do my part to rid Las Vegas of the community hoodlums, and I will do everything I can—

"By Mr. Bonner: Just a minute—

"By the Court: Sit down. He can make that argument, if he wants to.

"By Mr. Bonner: He cannot call that man a hoodlum.

"By Mr. Claiborne: I didn't call him a hoodlum.

"By the Court: He is not calling anybody a hoodlum. He says it is his duty to rid the community of hoodlums.

"By Mr. Claiborne: And to prosecute to the full extent of the law those who would violate the laws of our state and of our community."

I have no disposition to believe or to state that either Mr. Jones or Mr. Claiborne did not feel morally justified in making the arguments they respectively made. And if evidence of all that actually occurred upon the occasion of Joe Lark's visit to the defendant, and thereafter, and upon the occasion of the visit of the deceased, Joe Linabury, on the day of the homicide, to the defendant's home, including all the conversation that actually took place between the deceased and the defendant, were in the record before us, it might then be shown that all of the statements in such arguments were legally justifiable and proper. But that is mere conjecture, as no such record is before us.

A defendant is, at all stages of the proceedings in a case in which he is charged with a criminal offense, presumed to be innocent until he is proved guilty, by competent, relevant and material evidence, beyond a reasonable doubt. Only such evidence, direct or circumstantial, or both, meeting the legal requirements, and such reasonable, legitimate inferences as may legally be drawn therefrom, can properly be considered by a trial court or jury in determining a defendant's guilt or innocence of the crime charged. Mere conclusions based on supposition, assumption, conjecture or imagination, and not upon competent, legal and sufficient evidence, cannot, with proper regard for truth or justice, be permitted to assume the role of legitimate factual inferences in the determination of guilt or innocence. While much latitude is frequently allowed attorneys in argument, same cannot be allowed to be abused to the extent of permitting conjectural or speculative opinions of counsel to take the place of sound, legitimate inferences, reasonably drawn from evidence of actual facts.

In the instant case, speaking solely from the record, it appears that counsel for the state expressed a conjectural conclusion that, because certain bags or sacks were later proved to have contained jewelry, the defendant must have become aware of their contents at some time during the short period when Joe Lark had them on the table in defendant's home, when there is no evidence to show that they were opened or closed, or whether or not the defendant was in a position to see in them, if open, or whether or not he actually looked in them, and upon such purely conjectural basis, created solely by counsel, counsel proceeded to the conclusion that defendant was a "hoodlum." How counsel reached this conclusion is again left to conjecture, but we may surmise that he meant to convey the idea that defendant was a "hoodlum" because he did not report to the

police the robbery which, evidently, the district attorney assumed that defendant knew of, or because, perhaps, he may have become aware the jewelry was in the sacks, and, if so, may have conceived the cunning idea or scheme of professing righteous indignation, and driving Joe Lark away, supposing that Joe Lark would so fear the police finding him with the loot that he would not take it with him—a hypocritical form of indirect highjacking. That these various imaginary theories, based upon counsel's conjectural conclusion that defendant knew what was in the sacks, are possible, serves to make clear the danger of permitting such conjectural conclusions of the district attorney, or his deputy, in argument, to take the place of legitimate inferences based upon facts.

"Hoodlum" is an opprobrious term, defined in Webster's New International Dictionary, second edition, as "a young rowdy." In the public mind, the term "hoodlum" is associated with "gangster," because young rowdies, or hoodlums, often operate collectively, in groups or gangs. Mr. Jones conveyed the "gang" idea further by using the plural in that respect. He said, as hereinbefore quoted:

"*They* came here from Detroit. . *They* were working in a gambling hall. *They* were friends and consorting with a known robber. In addition to that, we know that the defendant, Teeter, had in his house and that he used a loaded revolver. I think that makes the *whole lot of them hoodlums*. As long as I am District Attorney of this county, I will do everything in my power to keep *these* out of the state, *hoodlums* from coming in here, committing acts of violence, killing *each other*—." (Emphasis added.)

The average citizen dreads the idea of "gangs of hoodlums" or "gangsters" becoming established in his community. Citizens read of such "gangs" and their criminal depredations in the larger cities, and fear that

such things may happen in their communities; and when citizens who happen to be jurors are invited by public officials in whom they have confidence, such as a district attorney, or his deputy, to join in a crusade to rid the community of such undesirable elements, they are likely, as good citizens, to respond. This may easily lead jurors under such circumstances, especially under the influence of impassioned eloquence, to forget the limitations of their duties as jurors, and, instead of determining the guilt or innocence of the defendant solely upon the facts as proved by the evidence and the law as instructed by the court, they may, under the influence of such argument, forget the weakness of the evidence in the particular case and convict the defendant upon "general principles," or "for the benefit of the community."

Repeatedly, in the past, this court has had occasion to consider the propriety of argument of prosecuting attorneys under somewhat similar circumstances as in the instant case. We cite State v. Rodriguez, 31 Nev. 342, 102 P. 863. In that case Mr. Justice SWEENEY, in his opinion, on page 346 of 31 Nev., on page 864 of 102 P., stated:

"I do not think it is stating it too strongly to say that, once such a charge is made against a man, if believed to be true, it would be difficult to find any jury in this state which would not be so prejudiced as to bring in a verdict of conviction against an accused, no matter on what charge he was being tried, believing that in so doing that on general principles they would be in a measure justified in not having strictly adhered to the evidence and instruction of the court.

"Considering the character of the case made against the defendant, the seriousness of these charges, unsupported by the evidence, and the fact that they were made before the jury in the closing argument when counsel for defendant had no opportunity to criticise or reply to them, and considering the remarks coming from an officer of the court clothed with authority to

speak for the state, and a public officer whom juries have a right to regard as unprejudiced, impartial, and nonpartisan, and bent only on seeing justice done and the law vindicated in accordance with the rules of law, we cannot say that the mere objection of counsel for defendant, and admonishment of the court to the jury to disregard the statement of the district attorney, were sufficient to remove from the minds of the jury the poison and prejudice already sown against the defendant by the district attorney.

"We cannot escape the conclusion that the fair and impartial trial to which the defendant was entitled was prejudiced by the remarks of the district attorney, and that the remarks were well calculated to influence the jury in the present case. People v. Bowers, 79 Cal. 415, 21 P. 752; People v. Treat, 77 Mich. 348, 43 N.W. 983; State v. Ulrich, 110 Mo. 350, 19 S.W. 656; Holder v. State, 58 Ark. 473, 25 S.W. 279; State v. Irwin, 9 Idaho 35, 71 P. 608, 60 L.R.A. 716, citing with approval [Holder v. State], 58 Ark. 473, 25 S.W. 279; Gutzman v. Clancy, 114 Wis. 589, 90 N.W. 1081, 58 L.R.A. 744; Prewitt-Spurr. Mfg. Co. v. Woodall, 115 Tenn. 605, 90 S.W. 623; Ivey v. State, 113 Ga. 1062, 39 S.E. 423, 54 L.R.A. 959; Wilson v. Territory, 9 Okl. 331, 60 P. 112; State v. Balch, 31 Kan. 465, 2 P. 609.

"Prosecuting attorneys, unfortunately, too often forget in their zeal to secure convictions, that they have a duty to perform equally as sacred to the accused as to the state they are employed to represent, and that is to see that the accused has the fair and impartial trial guaranteed every person by our Constitution, no matter how lowly he may be, or degrading the character of the offense charged, and that it is equally as reprehensible for prosecuting attorneys to violate their oath as an attorney and officer of the court in this respect, as they are censurable if they allow the guilty to escape the trial and punishment provided by law. It is their duty to use all fair, honorable, and lawful means to secure the conviction of those who may be indicted, but, in so doing,

they should also see that nothing but competent evidence is submitted to the jury, and, above all things, should not in their actions before or statements to a jury make prejudicial and improper statements which they know would not be admissible otherwise. It seems to be a peculiar trait and ambition of some prosecuting attorneys, carried away through misguided zeal, to overprove their case when a conviction is otherwise certain, and to exert their skill and ingenuity in seeing how far they can trespass on the verge of error, and, generally in so doing, trespass upon the rights of the accused, thus causing the necessity of courts of last resort to reverse causes and order new trials, to the expense and detriment of the commonwealth and all concerned."

See, also: State v. Petty, 32 Nev. 384, 108 P. 934, Ann.Cas.1912D, 223; State v. Cyty, 50 Nev. 256, 256 P. 793, 52 A.L.R. 1015. It is believed appropriate, in the discussion of this assignment of error No. 9, to quote the following from the excellent opinion of the late Mr. Justice COLEMAN, in State v. Cyty, supra, on page 259 of 50 Nev. page 794 of 256 P.:

"Such misconduct is due to a variety of causes—sometimes to inexperience of the district attorney, sometimes to his vaulting ambition, sometimes to the fact that he is innocently carried away by the exuberance of his own misguided zeal, and sometimes to the bias or prejudice of special counsel—but whatever contributes to such an abuse of a great power, it is the duty of the court, unsolicited, to reprimand instantly such misconduct, and it is the part of a fairminded prosecutor, when reminded of his indiscretion, to do all in his power to right the wrong done, remembering that he is the representative of the sovereign people of the state, who seek only the administration of justice.

"There is no excuse for such misconduct in any kind of a case. If the state has a strong case it is not necessary, and if it has a close case such misconduct is gross injustice to the defendant. Furthermore, prosecutors should remember that such misconduct often leads to the

expense of burdensome retrials, which can be a serious reflection upon their regard for the welfare of the taxpayer."

The trial court, in overruling defendant's objections to improper portions of the arguments of the district attorney and his deputy, and in refusing, from time to time, to admonish the jurors to disregard such improper argument, committed prejudicial error. Experience clearly shows that improper argument of the kind indulged in this case has a tendency to prevent a defendant from having such a fair and impartial trial as is guaranteed by the constitution of this state. It is unnecessary to decide whether such error in permitting improper arguments of counsel, or the other errors hereinbefore mentioned, with the exception of those relative to the exclusion of the dying declaration, would, if standing alone, constitute reversible error. As above indicated, the exclusion of the dying declaration did constitute reversible error, and, upon the basis of that error, together with the other errors hereinbefore mentioned, reversal is clearly indicated.

Assignment of error No. 10 has been considered and found without merit. The instruction No. 17 complained of is one usually given in murder cases, and refers, illustratively, to a situation in which the unlawful act which would constitute murder in the second degree is one in which an assault with a deadly weapon occurs, but in which there is no actual intent to kill. Not all of the law of the case is required to be included in one instruction. Instruction No. 17 embodies the state's theory of the case, and is upon the hypothesis that the evidence establishes such theory. It usually devolves upon counsel for defendant to prepare and submit instructions applying particularly to, and properly stating, defendant's theory of the case. Counsel for defendant did not except to Instruction No. 17, nor does it appear that he submitted an instruction explaining the meaning of "unlawful act" in connection with the use of a deadly weapon.

■ Referring to assignment No. 11, it is our view that a new trial should have been granted upon the second ground only, as such ground is stated in the notice of motion, to-wit: "That the Court has erred in the decision of questions of law arising during the course of the trial." We could not reverse upon the third ground of the motion, namely, the failure of the trial court to grant a new trial upon the ground that the verdict is contrary to the law and the evidence, as it cannot reasonably be concluded that there was no substantial evidence to support the verdict of the jury. See State v. McKay, 63 Nev. 118, on page 154, 165 P.2d 389, on page 405, 167 P.2d 476, and the many cases therein cited, upon the point that this court will not reverse for insufficiency of the evidence to sustain the verdict or judgment if there is any conflict in the evidence, or any substantial evidence to support such verdict and judgment.

It is ordered that the judgment and order appealed from be, and are hereby, reversed, and that a new trial be, and is hereby, granted, and that the custody of defendant, Fredrick William Teeter, be transferred from Richard Sheehy, warden of the Nevada state prison, to Glen C. Jones, sheriff of Clark County, Nevada, to be held by the latter until and during such new trial, and until the further appropriate order, judgment or commitment of the trial court, unless sooner admitted to bail by a court, justice, judge or other magistrate having jurisdiction so to do.

BADT, J., concurring:

I concur in the order of reversal for the reason that the dying declaration was improperly excluded. As to the knowledge and belief of the declarant that he was in extremis and as to whether he was in position to testify to the facts and circumstances of the shooting, see the foregoing opinion of Mr. Justice HORSEY. As to the objection made that the declaration of the decedent,

the victim of the shooting, that there had been an accident, that he had been shot accidentally, was a statement of opinion and simply the conclusion of the witness, I am satisfied that under the factual situation appearing, the declaration must be considered a statement of fact. If the declarant's statement that it was an accident had been the result of his reasoning from collateral facts and conditions, such as that the defendant was of kindly disposition, that he would not do such a thing, that he was a friend of declarant, that there was no cause or reason for the defendant to shoot him, etc., then the statement would properly be classified as opinion or conclusion. It did not purport to be such under the circumstances and cannot be so considered. The fine line between a statement of ultimate fact and a conclusion of law is often hard to draw. Testimony as to ownership is technically a conclusion, yet it is readily admitted, although some authorities hold otherwise. Many of the simplest facts recited in everyday conversation, if subjected to fine analysis, are found to be conclusions. As to the present question, one illustration will convey my meaning. A person standing at the head of a stairway observes two persons descending below him. A woman is descending the stairs followed by a man a few steps above her. The woman falls and is killed. There being no question as to any intentional act on her part, one of two *factual* possibilities remains, either she fell accidentally or the man behind pushed her. Many probative facts may enter into each possibility. Direct testimony that the man pushed her would seem to be the testimony of a fact, yet technically this itself is a conclusion. The same observation applies to testimony that she fell accidentally. Language is not, under all circumstances and to all people, a perfect vehicle to carry some particular fact. Sometimes a technical conclusion is simply "a shorthand rendering of the facts." See cases gathered in annotation to State v. Meyer, 65 N.J.L. 237, 47 A. 486, 86 Am.St.Rep. 650

et seq. In any event, where the facts governing the admissibility of the dying declaration are in dispute it is the law of this state (State v. Scott, 37 Nev. 412, 142 P. 1053, despite the vigorous dissenting opinion of Mr. Chief Justice TALBOT) that those facts be submitted to the jury and not be determined preliminarily by the court. The prevailing opinion by Mr. Justice McCARRAN in the case cited can be read in no other way and is decisive of the point unless we choose to reverse it.

McKNIGHT, District Judge (dissenting) :

Defendant was convicted of murder in the second degree, and has appealed from the judgment and from the order denying a new trial. He has assigned eleven alleged errors, on which he relies for a reversal, as follows :

1. The court erred in denying defendant's motion for bail.

2. The court erred in denying defendant's motion for change of venue.

3. The court erred in granting the motion to add names of certain witnesses to the information.

4. The court erred in denying defendant's challenge for cause of juror Marva Ray Johnson.

5. The court erred in allowing the State to examine witness Bernard J. Handlon in such a manner that evidence which tended to show defendant committed the separate and distinct crime of robbery was brought before the jury.

6. The court erred in allowing Capt. Sam Irick to testify as to certain extrajudicial statements allegedly made by defendant over latter's objection.

7. The court erred in allowing Bernard J. Handlon to testify as to certain extrajudicial statements of defendant, and overruling the latter's objections.

8. The court erred in refusing to allow Capt. Sam Irick to testify as to dying declaration made by deceased.

9. The court erred in refusing to instruct the jury to disregard improper statements of the district attorney and his deputy in their arguments.

10. The court erred in giving instruction No. 17.

11. The court erred in denying the motion for a new trial.

All of these assingments of alleged errors have been considered in their numerical order in the prevailing opinion, and the majority of this court has held that assignments Nos. 2, 3, 6, 7, and 10 are without merit. With this conclusion I agree. I do not agree, however, with the disposition by the majority of this court of the other assignments of alleged error. These will now be considered.

The first assignment, that the court erred in denying defendant's motion for bail before conviction, cannot now be determined by this court, for two reasons: (1) because defendant's only remedy was by habeas corpus, and (2) because any legal question involved in this assignment is moot.

The statute providing for the review of an intermediate order or proceeding upon appeal from the final judgment in a criminal case, sec. 11087, N.C.L.1929, upon which the majority bases the right of this court to determine, upon appeal from the judgment, whether or not bail before conviction has been erroneously denied, is similar to section 398 of the old Civil Practice Act, sec. 5340, Rev.Laws 1912, sec. 8887, N.C.L.1929.

In construing the latter section, this court correctly held that an order from which a direct appeal could be taken was not within its purview, and that upon appeal from a final judgment, an intermediate order which was itself made the subject of a direct appeal, could not be reviewed. Maitia v. Allied Land & Live Stock Co., 49 Nev. 451, 248 P. 893.

It is true there is no statute providing for a direct appeal from an order denying bail in criminal cases. There are, however, statutory provisions expressly providing that all questions regarding the want of bail in criminal cases may be disposed of in habeas corpus proceedings. Secs. 11397–11399, N.C.L.1929.

That the writ of habeas corpus is an appropriate and

proper remedy in aid of bail has been repeatedly recognized by this court. Ex parte Isbell, 11 Nev. 295; Ex parte Finlen, 20 Nev. 141, 18 P. 827; Ex parte Douglas, 25 Nev. 425, 62 P. 49; Ex parte Nagel, 41 Nev. 86, 167 P. 689; Ex parte Jagles and Varnes, 44 Nev. 370, 195 P. 808.; Ex parte Malley, 50 Nev. 248, 256 P. 512, 515, 53 A.L.R. 395.

There is no difference in principle between a statute which provides for a direct appeal from an intermediate order and a statute which, in effect, provides that an intermediate order may be reviewed in habeas corpus proceedings, in that each provides an exclusive remedy for review of the specified intermediate order, and thus prevents the review of such an order on appeal from the final judgment. See Maitia v. Allied Land & Live Stock Co., supra, 49 Nev. 451, 462, 248 P. 893; State v. Cohen, 45 Nev. 266, 201 P. 1027, 18 A.L.R. 864, and note; Ex parte Stegman, 112 N.J.Eq. 72, 163 A. 422, 426.

In Ex parte Stegman, supra, the petitioners in habeas corpus proceedings alleged that the lower court had denied an application to reduce bail, which, as originally fixed, was excessive and in violation of their constitutional rights. In granting the writ admitting petitioners to bail, under statutory provisions practically the same as in Nevada, the court of chancery said:

"The remedy of a prisoner who is entitled to bail in cases in which the bail asked is excessive or who is denied bail is by habeas corpus, *and that is his only remedy,* and his right to invoke it is absolute, and the duty cast upon the court not only to grant the writ but to admit to bail is mandatory." Italics supplied.

As to the second reason, it cannot be denied that the legal question involved in this assignment is moot. In fact, it is so stated in the prevailing opinion, in these words:

"It is most unusual to wait until a determination of the right to bail would be unavailing, insofar as bail before conviction is concerned, and then to raise the question upon the appeal, upon the theory that the

alleged wrongful denial of bail goes to the validity of the judgment." See, also, State v. Cohen, supra, 45 Nev. 266, 201 P. 1027, 18 A.L.R. 864, and note; St. Pierre v. United States, 319 U.S. 41, 63 S.Ct. 910, 911, 87 L.Ed. 1199, and note.

In St. Pierre v. United States, supra, the appellant had been sentenced to a term of imprisonment for criminal contempt in refusing to answer a question asked him before a grand jury. His application for bail made to the district court and to the circuit court of appeals was refused; and he did not apply for a stay or a supersedeas. The case not having been brought to the supreme court until after appellant's sentence had been served, that court said:

"We are of opinion that the case is moot because, after petitioner's service of his sentence and its expiration, there was no longer a subject matter on which the judgment of this Court could operate. A federal court is without power to decide moot questions or to give advisory opinions which cannot affect the rights of the litigants in the case before it. (Citing cases.) The sentence cannot be enlarged by this Court's judgment, and reversal of the judgment below cannot operate to undo what has been done or restore to petitioner the penalty of the term of imprisonment which he has served."

Our supreme court has repeatedly refused to give opinions on moot questions or abstract propositions. State v. McCullough, 20 Nev. 154, 18 P. 756; Haley v. Eureka County Bank, 21 Nev. 127, 26 P. 64, 12 L.R.A. 815; Wedekind v. Bell, 26 Nev. 395, 412, 69 P. 612, 99 Am.St.Rep. 704; State v. Pray, 30 Nev. 206, 219, 220, 94 P. 218, 220; Foster v. Jones, 35 Nev. 248, 128 P. 986; Pacific Livestock Co. v. Mason Valley Mines Co., 39 Nev. 105, 111, 153 P. 431, 433; Earl v. Morrison, 39 Nev. 120, 154 P. 75; Ex parte Ming, 42 Nev. 472, 496, 181 P. 319, 6 A.L.R. 1216; Ex parte Moriarity, 44 Nev. 164, 173, 191 P. 360; Edwards v. City of Reno, 45 Nev. 135, 143, 198 P. 1090, 1092; State v. Cohen, supra, 45 Nev. 266,

201 P. 1027, 18 A.L.R. 864; City of Reno v. Second Judicial District Court, 58 Nev. 325, 78 P.2d 101; Morrow v. Morrow, 62 Nev. 492, 496, 156 P.2d 827.

It has even held that after a case had been argued and submitted for its decision and judgment, such case could and should be disposed of by dismissal without opinion when it appeared that the parties to the suit had settled it between themselves. Wedekind v. Bell, supra, 26. Nev. 395, 412, 69 P. 612, 614, 99 Am.St.Rep. 704.

In State v. Pray, supra, in City of Reno v. Second Judicial District Court, supra, and in Morrow v. Morrow, supra, this court quoted with approval from Mills v. Green, 159 U.S. 651, 16 S.Ct. 132, 133, 40 L.Ed. 293, the rule universally recognized:

"The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."

Do the facts in this case afford any reason, cause, provocation, justification or excuse for this court now holding that it will give opinions on moot questions or abstract propositions, contrary to the rule announced in all of the earlier Nevada decisions where the question arose? I think not.

The fourth assignment is, that the court erred in denying defendant's challenge for cause of juror Marva Ray Johnson.

The juror was asked: "You would require evidence before you would have an open mind? In other words, you would have to hear some evidence before you would feel that you were fair and impartial?" and she replied: "I would feel that I was more fair after hearing the evidence than I do now." Defendant's attorney thereupon interposed a challenge in the following words: "I believe, if Your Honor please, that is one of the grounds."

The challenge was not specific, in that it specified no ground upon which it was based, as expressly required by sec. 10948, N.C.L.1929. It was, therefore, insufficient and properly overruled. State v. Squaires, 2 Nev. 226, 230; State v. Raymond, 11 Nev. 98, 106; State v. Vaughan, 22 Nev. 285, 296, 39 P. 733; State v. Simas, 25 Nev. 432, 449, 62 P. 242; State v. Salgado, 38 Nev. 64, 70, 145 P. 919, 150 P. 764; State v. Milosovich, 42 Nev. 263, 269, 175 P. 139; State v. Lewis, 50 Nev. 212, 224, 255 P. 1002.

Moreover, had a specific challenge in this case been made, it should have been overruled, because the examination, taken as a whole, disclosed that the juror had not formed or expressed an unqualified opinion or belief in regard to the guilt or innocence of the defendant. Sec. 10946, N.C.L.1929; State v. Raymond, supra, 11 Nev. 98, 107; State v. Williams, 28 Nev. 395, 407, 82 P. 353; State v. Milosovich, supra, 42 Nev. 263, 269, 175 P. 139; State v. Lewis, supra, 50 Nev. 212, 228, 255 P. 1002.

The fifth assignment of error is, in effect, that the court erred in admitting testimony which tended to show that defendant had committed the separate and distinct crime of robbery.

Bernard J. Handlon, a detective sergeant of the Las Vegas police department, testified that he aided in the search of the home of defendant on the night of November 24, 1946, the date of the homicide, and that, as a result of said search, they "found a large amount of stolen jewelry from the armed robbery of the Jerry Jeram Store."

Upon motion of defendant's counsel that the answer be stricken, the court said:

"It may be stricken. The jury is admonished not to give any heed as to the word 'stolen,' or as to what he found in that relation. * * * It may be stricken, and the jury is admonished not to pay any attention as to any statements made by the witness as to finding jewelry in the premises. The Court had no way of

knowing what the answer would be until it was made. The jury is admonished not to pay any attention to that testimony."

The court thereafter gave an instruction reading as follows:

"The Jury is instructed that all evidence which has been ruled upon by the Court as being inadmissible should be disregarded by you."

The defendant took the stand in his own behalf, and, in response to questions propounded by his attorney, testified that deceased "had brought jewelry in that didn't belong there," that deceased told him "that Joe Lark had got the jewelry from the Jerry Jerram holdup"; that he stated to deceased: "Is that a nice thing to do, to bring that stuff in my place, in my house * * * I should turn you over to the police for bringing that stuff in my place."

In State v. Skaug, 63 Nev. 59, 64, 161 P.2d 708, 710, 163 P.2d 130, this court said:

"It is well settled that evidence that accused has committed another crime independent of and unconnected with the one for which he is on trial, is inadmissible. The rule has well established exceptions and both have received the attention of this court in a number of cases. State v. McMahon, 17 Nev. 365, 30 P. 1000; State v. Vaughan, 22 Nev. 285, 39 P. 733; State v. Roberts, 28 Nev. 350, 82 P. 100; State v. McFarlin, 41 Nev. 486, 172 P. 371; State v. Monahan, 50 Nev. 27, 249 P. 566; State v. Hall, 54 Nev. 213, 13 P.2d 624; State v. Behiter, 55 Nev. 236, 29 P.2d 1000." See, also, State v. Salgado, 38 Nev. 64, 76, 145 P. 919, 150 P. 764; State v. Cerfoglio, 46 Nev. 332, 338, 205 P. 791, 213 P. 102, 27 A.L.R. 848; State v. White, 52 Nev. 235, 254, 285 P. 503; State v. Lindsay, 63 Nev. 40, 41, 161 P.2d 351.

It is not necessary to determine whether the rule just mentioned, or any of the well-established exceptions thereto, apply to this case. If, as held in the prevailing opinion, the admission of the testimony constituted

error, which, in my opinion, is extremely doubtful, such error was cured and rendered harmless:

1. By the action of the court in promptly striking the testimony from the record and admonishing the jury to disregard it. State v. Urie, 35 Nev. 268, 274, 129 P. 305; 24 C.J.S., Criminal Law, sec. 1915e (1).

2. By the action of the court in later instructing the jury to disregard it. State v. Urie, supra, 35 Nev. 268, 274, 129 P. 305; 24 C.J.S., Criminal Law, sec. 1915e (2).

3. By the establishment of equivalent facts by the testimony of defendant when examined as witness in his own behalf. State v. O'Keefe, 23 Nev. 127, 133, 43 P. 918, 62 Am.St.Rep. 768; State v. Johnny, 29 Nev. 203, 219, 87 P. 3; State v. Williams, 31 Nev. 360, 367, 102 P. 974; State v. Urie, supra, 35 Nev. 268, 274, 129 P. 305; State v. Bachman, 41 Nev. 197, 207, 168 P. 733; State v. Behiter, 55 Nev. 236, 253, 29 P.2d 1000; Skidmore v. State, 59 Nev. 320, 331, 92 P.2d 979.

The eighth assignment is, that the court erred in refusing to allow Capt. Sam Irick to testify as to dying declaration made by deceased.

Had objections to the questions not been sustained, the witness would have testified that, in a conversation with the deceased in the hospital, approximately two hours after deceased was shot:

"I asked Mr. Linabury what had happened and he said there had been an accident—that he was shot accidentally."

That this statement of deceased was not admissible as a dying declaration, even though it be assumed that it "was made by the declarant when he was in extremis, and when he was fully conscious of that condition," is, in my opinion, too plain to admit of argument. However, as the majority of this court has held that its "exclusion from evidence was unjust to the defendant, and constituted reversible error," it is necessary to carefully consider the matter.

The admissibility of dying declarations is, in the first

instance, a question of law to be determined by the court on the preliminary proof or predicate for their admission. State v. Hennessy, 29 Nev. 320, 334, 90 P. 221, 13 Ann.Cas. 1122; State v. Scott, 37 Nev. 412, 425, 426, 427, 429, 430, 142 P. 1053; Wigmore on Evidence, 2d Ed., vol. 3, page 185, sec. 1451; Nichols, Applied Evidence, vol. 2, page 1843, sec. 100, note 12; Chamberlayne, Trial Evidence, 2d Ed., page 742, sec. 791; Underhill's Criminal Evidence, 4th Ed., page 393, sec. 212, note 55; 4 Encyc. of Evidence, page 947; 26 Am.Jur., Homicide, sec. 414; 40 C.J.S., Homicide, sec. 295d, p. 1268, note 8 Ann.Cas. 541.

But, after the declarations have been admitted in evidence, the weight and credibility to be given them are matters exclusively for the jury. State v. Scott, supra, 37 Nev. 412, 426, 427, 142 P. 1053; State v. Watts, 52 Nev. 453, 472, 290 P. 732; Wigmore on Evidence, 2d Ed., vol. 3, page 186, sec. 1451(b); Nichols, Applied Evidence, vol. 2, page 1844, sec. 101; Chamberlayne, Trial Evidence, 2d Ed., page 748, sec. 798; 26 Am.Jur., Homicide, secs. 414 and 425; 40 C.J.S., Homicide, sec. 295d, pp. 1269, 1270, Note 8 Ann.Cas. 541.

Dying declarations are only competent as to facts which the witness might testify to if living. People v. Alexander, 161 Mich. 645, 126 N.W. 837, 21 Ann.Cas. 150, 151; Hollywood v. State, 19 Wyo. 493, 120 P. 471, 122 P. 588, Ann.Cas. 1913E, 218, 223; State v. Wilks, 278 Mo. 481, 213 S.W. 118, 120; Marshall v. State, 219 Ala. 83, 121 So. 72, 63 A.L.R. 560, 564; 40 C.J.S., Homicide, sec. 303a, page 1281, notes 26–28; sec. 298, page 1274, note 48; Underhill's Criminal Evidence, 4th ed., sec. 217, page 404, note 98; Jones on Evidence, 4th ed., vol. 1, page 615, sec. 334, note 16; Chamberlayne, Trial Evidence, 2d Ed., page 746, sec. 797; 26 Am.Jur., Homicide, sec. 393, page 430; Wharton Criminal Evidence, 11th ed., vol. 1, page 900, sec. 548.

The same rules which govern the admissibility of evidence, if the deceased were placed on the witness stand to testify, will be applied to his dying declaration,

when offered for admission; and the character of evidence which would be excluded, if presented by a witness on the stand, must be excluded if presented as his dying declaration. Coots v. Commonwealth, 295 Ky. 637, 175 S.W.2d 139, 140.

If Linabury had been sworn as a witness, it would not have been competent for him to have testified that "there had been an accident—that he was shot accidentally," because these statements were mere declarations of his opinion. State v. Ross, 32 La.Ann. 854, 856; Stone v. Denny, 4 Metc., Mass., 151, 164; Abbott on Facts, 5th ed., sec. 44; 5 Encyc. of Evidence, page 659, note 86, page 670, note 13, page 686, note 61.

See, also, State v. Wright, 112 Iowa 436, 84 N.W. 541, 544, where the court held that the statement by the deceased "that he did not believe defendant intended to shoot him is an opinion merely, and would not be received from a living witness."

A mere expression of opinion by a dying man is not admissible as a dying declaration. Jones v. State, 52 Ark. 345, 347, 12 S.W. 704; Berry v. State, 63 Ark. 382, 38 S.W. 1038; State v. Wilks, supra, 278 Mo. 481, 213 S.W. 118, 120; Roberts v. Commonwealth, 301 Ky. 294, 191 S.W.2d 242, 243; Marshall v. State, 219 Ala. 83, 121 So. 72, 63 A.L.R. 560, 566; Note Ann.Cas.1913E, 228; Note 63 A.L.R. 567; Wharton's Criminal Evidence, 11th ed., vol. 1, page 863, sec. 535; 4 Encyc. of Evidence, page 993; 40 C.J.S., Homicide, sec. 299a, page 1277, note 70.

It is immaterial whether the fact that the declaration is a mere opinion appears from the statement itself, or from other undisputed evidence, showing that it was impossible for the declarant to have known the fact stated. Jones v. State, supra, 52 Ark. 345, 12 S.W. 704; Berry v. State, supra, 63 Ark. 382, 38 S.W. 1038; State v. Wilks, supra, 278 Mo. 481, 213 S.W. 118, 120; Note Ann.Cas. 1913E, 228; 4 Encyc. of Evidence, page 993; 40 C.J.S., Homicide, sec. 299a, pages 1277, 1278, note 74.

But what constitutes an opinion and what constitutes a statement of fact is a matter upon which the courts

"are decidedly not in harmony." State v. Strawther, 342 Mo. 618, 116 S.W.2d 133, 120 A.L.R. 583, 589; Note 25 A.L.R. 1376; Wharton's Criminal Evidence, 11th ed., vol. 1, page 866, .sec. 536; 26 Am.Jur., Homicide, sec. 395, page 431, note 6.

For the purpose of determining that question, it is proper to take into consideration not only the statement itself, but the surrounding circumstances. State v. Strawther, supra, 342 Mo. 618, 116 S.W.2d 133, 120 A.L.R. 583, 589; 26 Am.Jur., Homicide, sec. 395, pages 431, 432, note 11.

The true and proper test as to admissibility is whether the statement is the direct result of observation through the declarant's senses, or comes from a source of reasoning from collateral facts. If the former, it is admissible; if the latter it is inadmissibile. House v. State, 94 Miss. 107, 48 So. 3, 21 L.R.A.,N.S., 840, 843; Hollywood v. State, supra, 19 Wyo. 493, 120 P. 471, 475, 122 P. 588, Ann.Cas.1913E, 218, 222; Wharton's Criminal Evidence, 11th ed., vol. 1, sec. 536, page 868, note 10; 40 C.J.S., Homicide, sec. 299a, page 1278, note 76.

It certainly cannot be said that the deceased's statement that "there had been an accident—that he was shot accidentally," was "the direct result of observation through the declarant's senses," for three reasons:

1. According to testimony introduced by the prosecution, deceased was shot in the back which made it physically impossible for him to have observed the defendant, or the gun, or any other thing to his rear.

That defendant shot Linabury in the back is thus established, provided such testimony is true, by his statement to Detective Bruce Thomas Woofter on the evening of November 24, 1946, the date of the shooting, in the Las Vegas detective bureau office, that he shot him in the back; by his statement to Detective Sergeant Bernard J. Handlon, about 3:45 o'clock p. m., November 29, 1946, in defendant's residence, that it sure looked tough because he had sure shot Mr. Linabury in the back; by his statement to Captain of Detectives O. L.

Slark, about 4 o'clock p. m., November 29, 1946, in the city police department, that "It looks tough because I shot him in the back"; and by the fact that the hole in the back was clean cut, while the hole in the chest was slightly larger, with the skin slightly stretched or torn, and the opinion by Dr. J. C. Cherry that the exit of the bullet was in front.

That the deceased was shot in the back is also indicated by the fact, testified to by Detective Sergeant Bernard J. Handlon and not denied by defendant, that on November 29, 1946, in the room of the dwelling where deceased was shot, defendant voluntarily stated:

"Mr. Linabury was walking toward the bedroom, preparing to go through the door from the kitchen to the bedroom, with his back to him, when he turned his head slightly with a sneer on his face, and at that time the gun went off."

That deceased was shot in the back is further indicated by the course of the bullet.

The bullet passed entirely through the body. The wound in the front was on the right side of the chest in the middle of the sternum or breastbone, at about the level of the third rib, while the wound in the back was at about the same level, just below the right shoulder blade and between it and the spine.

2. If, instead of having been shot in the back, as indicated by the foregoing testimony, thus making it physically impossible for the deceased to have seen the defendant or the gun, the deceased had been looking directly at defendant, he could not have observed anything upon which to base his expressed opinion.

Edward G. Cupit, who qualified as an expert on firearms, testified that the lethal weapon was a Colt 32.20 single action revolver; that it could not be fired by pulling the trigger unless it was cocked; that to cock the revolver, it was necessary to push back the hammer; that it could also be fired by holding the trigger back with one hand and pushing back the hammer with the other hand, commonly called "fanning a gun"; that

about eight o'clock on the date of the shooting, he asked the defendant how he had cut the middle finger on his left hand, which was then bleeding, and the defendant "answered that he was fanning the gun with his left hand, that it was an old side-wheeler."

Luther Horner, identification officer of the Las Vegas police department, testified that he was present on the date of the homicide and heard Edward G. Cupit ask defendant how he had injured the middle finger of his left hand, and heard the defendant state that the gun was an old side-wheeler, and that he was fanning it with his left hand.

The defendant testified, in effect, that after an unfriendly discussion with deceased about the bringing of stolen jewelry by deceased into the home of defendant, where deceased also resided, he asked deceased to leave his house, get his clothes, and get out; that deceased just sat and leered at him; that he went into the bedroom and secured his gun; that upon returning, with the gun in his right hand, he told deceased to get his clothes together and get out of his place; that deceased kind of hesitated for a minute, then rose, and started toward the bedroom; that defendant, with the gun in his hand, followed deceased, watching him; that deceased started into the bedroom, and suddenly the gun went off; that deceased was opening the bedroom door, and had turned, started to turn around towards defendant, and had gotten far enough around that defendant could see his whole face, before the gun went off; that he followed the deceased until the latter reached the door of the bedroom and was about to enter; that the gun went off while he was walking along, watching the deceased; that the second finger of his left hand was cut rather deep by the firing of the gun; that he did not make any statement to Edward G. Cupit about fanning the gun.

It is established by this testimony that, at and immediately before deceased was shot, defendant was walking towards deceased, watching him, holding a loaded

gun pointed at deceased in his right hand and pushing the hammer thereof back with his left. Nothing else could have been possibly seen by deceased, even though he had been looking directly at defendant. Such testimony affords no basis whatever for an opinion that the shooting was accidental.

3. The defendant was engaged in an unlawful act.

It is clearly established in this case that at the time deceased was shot, defendant was in the commission of an act inhibited and declared to be unlawful by statute—that of aiming a loaded revolver at a human being. Sec. 10292, N.C.L.1929.

It is also provided by statute that excusable homicide by misadventure, is when a person is doing a lawful act, without any intention of killing, yet unfortunately kills another. Sec. 10082, N.C.L.1929.

The word "misadventure," as used in this statute, means "accident." 26 Am.Jur., Homicide, sec. 106; Ballantine, law dictionary, page 821.

The words "homicide by misadventure," as used in this statute, means the accidental killing of another, when the slayer is doing a lawful act, without any intention of killing, yet unfortunately does so. State v. Blackburn, 7 Pennewill, Del. 479, 75 A. 536, 539; Commonwealth v. Gill, 120 Pa. Super. 22, 182 A. 103, 105; Commonwealth v. Flax, 331 Pa. 145, 200 A. 632, 637; State v. Goodwin, 189 La. 443, 179 So. 591, 602; Note 3 L.R.A.,N.S., 1153.

As the defendant was engaged in an unlawful act, but for which the deceased would not have been shot, the homicide cannot be attributed to an accident. Hollywood v. State, supra, 19 Wyo. 493, 120 P. 471, 122 P. 588, Ann.Cas. 1913E, 218, 226; Jabich v. People, 58 Colo. 175, 143 P. 1092, 1094; Note 3 L.R.A.,N.S., 1156.

If it can possibly be assumed, under any conceivable theory, that Linabury actually believed that "there had been an accident—that he was shot accidentally,"—he should have stated the facts, or at least some of them, in support of his belief. Instead, not a single fact upon

which the opinion was predicated was disclosed. He failed to show any circumstances, acts or conduct from which such a belief could be inferred. Linabury may have been mistaken as to the facts. His conclusions upon which he based his opinion may have been erroneous. The reasons for his belief may have been unsound. What to his mind justified his opinion may not have been any justification at all. The facts connected with the homicide, which prompted deceased to state his opinion, would have been admissbile, but not mere matters of opinion or belief based upon them. Kearney v. State, 101 Ga. 803, 29 S.E. 127, 65 Am.St.Rep. 344, 345; Ogletree v. State, 115 Ga. 835, 42 S.E. 255; Gray v. State, 12 Ga.App. 634, 77 S.E. 916; Young v. State, 70 Ark. 156, 66 S.W. 658; Mann v. Commonwealth, 215 Ky. 731, 286 S.W. 1044; Skelley v. State, 64 Okl.Cr. 112, 77 P.2d 1162, 1178; Id., 65 Okl.Cr. 54, 82 P.2d 843; 4 Encyc. of Evidence, page 994, notes 76, 78; 26 Am.Jur., Homicide, sec. 395, page 432, note 1; Wharton's Criminal Evidence, 11th ed., vol. 1, sec. 538, note 17.

The case of Commonwealth v. Matthews, 89 Ky. 287, 12 S.W. 333, 11 Ky.Law Rep. 505, so strongly relied upon in the majority opinion, is not in point so far as concerns the question whether the declaration of the deceased in this case was one of fact or opinion. There, the statement of deceased, in substance, was that he and the accused were playing, and that it was an accident. In other words, the statement that the shooting was an accident was accompanied by the statement of fact that the parties were engaged in play. Without the inclusion of such statement of fact, the statement that the shooting was an accident would not have been admitted. This, in effect, was so held in the later Kentucky case of Mann v. Commonwealth, supra, 215 Ky. 731, 286 S.W. 1044, 1045, where a judgment of conviction was reversed because the trial court admitted in evidence the following dying declaration claimed to have been made by

deceased: "Alton Mann shot me; it was not an accident; it was only a waylay." In doing so, the appellate court said:

"While a few of the courts take a contrary view, the great weight of authority, and the rule prevailing in this state, is to the effect that mere conclusions or expressions of opinion on the part of the declarant are not admissible as dying declarations. * * * Here the declarant did not undertake to describe the situation of the parties, or to state any facts leading up to, or connected with, the homicide, and we are constrained to hold that the statement that it was not an accident but it was only a waylay was a mere conclusion and should not have been admitted. It is true that we held in Commonwealth v. Matthews, 89 Ky. 287, 12 S.W. 333, 11 Ky.Law Rep. 505, that a dying statement by the deceased that he and the accused had been engaged in play, and that the shooting was an accident was admissible, but there the statement that the shooting was an accident was accompanied by the statement of fact that the parties were engaged in play, and the rule excluding opinions or conclusions is not so strictly enforced where the declaration is favorable to the defendant. * * * On another trial the court will admit only the statement, 'Alton Mann shot me.'" See, also, Stewart v. Commonwealth, 235 Ky. 670, 32 S.W.2d 29, 33.

Moreover, the minority view adopted in Louisiana and Kentucky (State v. Ashworth, 50 La.Ann. 94, 23 So. 270, 273, and Haney v. Commonwealth, 5 Ky.Law Rep. 203, and other Kentucky cases), and cited in the majority opinion herein, that "the rule excluding opinions or conclusions is not so strictly enforced where the declaration is favorable to the accused," is not sound, and should not be adopted as the rule in Nevada. Sims v. State, 98 Tex.Cr. R. 101, 263 S.W. 289, 290; Wharton's Criminal Evidence, 11th ed., vol. 1, sec. 538.

As said in Sims v. State, supra:

"We so seriously doubt the soundness of the announcement as to be unwilling to ingraft it upon our system of procedure. One accused of crime in this state is now given the presumption of innocence, the benefit of reasonable doubt, the right of appeal, and complaint of all rulings thought to be adverse; and in the absence of some stronger showing of authority or reason for adopting the rule suggested, we must respectfully decline to give it our approval."

It is clear that the court did not err in refusing to admit the offered testimony.

The ninth assignment, that the court erred in refusing to instruct the jury to disregard improper statements of the district attorney, and his deputy, in their arguments, does not, in my opinion, require much discussion.

Whether remarks of the prosecuting attorney in argument amount to reversible error, depends somewhat upon the whole record. State v. Clancy, 38 Nev. 181, 184, 147 P. 449.

A very careful reading of the entire record in this case fails to disclose that either the district attorney, or his deputy, claimed that the defendant was guilty of any offense other than that on which he was being tried, or that either of them made any statement not warranted by the testimony. It is true that the defendant was referred to as a hoodlum, but the characterization finds support in the testimony.

A "hoodlum" is a young rowdy. State v. Palmer, 206 Minn. 185, 288 N.W. 160, 164.

A "rowdy" is one who engages in rows, or noisy quarrels, or rough behavior; a ruffianly fellow; a rough. Webster's New International Dictionary, 2d ed.

It is unnecessary to refer to the testimony of defendant, other than that hereinbefore set forth and that stated in the prevailing opinion, to show that defendant was admittedly one who engaged in rough behavior.

The cases of State v. Rodriguez, 31 Nev. 342, 102 P. 863; State v. Petty, 32 Nev. 384, 108 P. 934, Ann.Cas. 1912D, 223, and State v. Cyty, 50 Nev. 256, 256 P. 793,

52 A.L.R. 1015, relied upon in the majority opinion, are not in point.

In the Rodriguez case, the district attorney charged in his argument that the defendant was a "macque," which was unwarranted by any evidence introduced; in the Petty case, the district attorney stated that the defendant knew that an endeavor to establish an alibi would be futile, and also knew that a legitimate defense of insanity would not avail him anything, when there was nothing in the evidence tending to establish the existence of such facts, and in the Cyty case, the district attorney, without any testimony warranting such conclusions, used the following language in his closing argument: "As he told me today in talking to me, he gloried in the fact that he would use a gun. He indicated that he would use a gun at the slightest provocation."

In argument a district attorney is entitled to state to the jury any fact or facts which the evidence tends to establish, or any legitimate inference which may be drawn from such evidence. State v. Robison, 54 Nev. 56, 71, 6 P.2d 433. See, also, State v. King, 35 Nev. 153, 157, 126 P. 880; State v. Lewis, 59 Nev. 262, 274, 91 P.2d 820.

The eleventh assignment, that the court erred in denying the motion for a new trial, is disposed of, so far as the law is concerned, by what has heretofore been said, and so far as the facts are concerned, by the statement in the prevailing opinion herein, that "it cannot reasonably be concluded that there was no substantial evidence to support the verdict of the jury."

As the record fails to disclose any prejudicial error, the judgment and the order denying a new trial should be affirmed.

EATHER, C. J., being ill and unable to participate in the consideration of this case, the Governor designated Hon. Wm. McKNIGHT, Judge of the Second Judicial District Court, to sit in his place.